ELECTRONICALLY FILED
2022 Oct 21 PM 4:43
CLERK OF THE JEFFERSON COUNTY DISTRICT COURT
CASE NUMBER: JF-2022-CV-000073
PII COMPLIANT

**EXHIBIT**

**5**

# IN THE SECOND JUDICIAL DISTRICT
## DISTRICT COURT OF JEFFERSON COUNTY, KANSAS
## CIVIL DEPARTMENT

|  |  |  |
|---|---|---|
| CRYPTO COLO CENTER CORP. | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. |
| | ) | |
| DEI VITAE ENTERPRISES, LLC | ) | |
| AND | ) | |
| JAMES REUBEN BURTON, JR. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PETITION FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiff Crypto Colo Center Corp. ("CCC") for its causes of action against defendants Dei Vitae Enterprises, LLC ("DVE") and James Reuben Burton, Jr. ("Burton") states and alleges:

### Parties, Jurisdiction and Venue

1.     CCC is a Kansas for profit corporation with its registered office in Kansas located at 4601 E. Douglas Ave., Suite 150, Wichita, Kansas 67218.

2.     Dei Vitae Enterprises, LLC is a North Carolina for profit corporation located at 105 Graham Hall Court, Matthews, NC 28104. DVE does business in the state of Kansas, as described more fully below; however, DVE has not registered as a foreign limited liability company in the state of Kansas.

3.     James Reuben Burton, Jr. is an individual who resides in North Carolina. Burton can be served at 2407 Plantation Center Drive, Matthews, NC 28105.

4.      Personal jurisdiction is proper in this case because, at all material times, the

defendants transacted or attempted to transact business within the state of Kansas, and Defendant

committed the tortious acts described in this Petition in Kansas. Additionally, DVE owns property

at issue in that matter located in the state of Kansas.

5.      Venue is proper in this Court because a substantial part of the complained-of events

or omissions occurred within this judicial district.

### Common Allegations

6.      CCC is a colocation data center company, which is in the business of providing

colocation and data center services and infrastructure to internet hosting, crypto mining, and

metaverse crypto companies.

7.      DVE is a foreign LLC that owns real estate in the state of Kansas.

### The CCC-DVE Lease Agreement

8.      CCC entered into a Lease Agreement ("the Lease") with DVE on February 16, 2022

which permitted CCC to be a Tenant with respect to 81.9 acres of real property owned by DVE in

Jefferson County, Kansas (the "Premises"). A copy of the Lease is attached as **Exhibit A** to this

Petition.

9.      The Lease provides for a ten (10) year initial term, commencing June 1, 2022, and

allows CCC to use the Premises "for any lawful commercial purpose, including, but not limited

to, the construction, placement, use and operation by [CCC] of structures or containers used to

house equipment for the processing of mathematical equations to confirm distributed ledger

transactions" (the "Permitted Use").

10.     The Lease provides the following:

**RE-ZONING**. Promptly following the Effective Date, Landlord shall use
commercially reasonable efforts to work in consultation, and cooperate, with
Tenant to determine whether the zoning classification for the Premises allows for

Tenant's Permitted Use. In the event that the present zoning classification does not allow for Tenant's Permitted Use, Landlord shall use its best efforts to work diligently, and cooperate, with Tenant to cause such zoning classification to allow for Tenant's Permitted Use within thirty (30) days of the Effective Date. If Landlord refuses to work, and/or cooperate, with Tenant to cause such zoning re-classification to allow Tenant's Permitted Use prior to the expiration of such 30-day period, then Tenant may either: 1) terminate this Lease and this Lease shall be of no further force and effect, in which case Landlord shall (i) immediately return the Security Deposit to Tenant, (ii) reimburse Tenant for all of Tenant's out of pocket costs in designing, developing and constructing any improvements on the Premises, and (iii) reimburse Tenant for its reasonable actual attorney's fees in negotiating this Lease; or 2) elect to continue this Lease, and for each day that Tenant is unable to use the Premises for its Permitted Use, Landlord shall credit Tenant 250% of the monthly rent (pro-rated on a 30-day month), until such time as Landlord has delivered evidence reasonably satisfactory to Tenant that the Permitted Use complies with the applicable zoning classification.

11.    Section 29 of the Lease provides that CCC is entitled to quiet possession of the Premises, and DVE is entitled to limited right of entry pursuant to Section 11 of the Lease.

12.    CCC has engaged in efforts to secure necessary permits to conduct its business operations at the Premises. However, DVE has failed and refused to assist or cooperate with these efforts as required by the Lease.

13.    Specifically, counsel for CCC served, in accordance with the terms of the Lease, DVE's registered agent and managing director affidavits which DVE was required to sign by Jefferson County to process CCC's application for a conditional use permit to conduct its business operations on the property. CCC provided this notice on October 10, 2022. After follow-up communications, DVE's registered agent and member Susan Burton informed CCC on October 15, 2022 that DVE would not provide the necessary affidavit.

14.    In response, CCC provided DVE further correspondence on October 17, 2022 which detailed DVE's obligations under the Lease and outlined DVE's breach of the Lease. October 17, 2022 Letter, **Exhibit B**. In conjunction with this correspondence, CCC provided additional affidavits and requested that those affidavits be signed and sent to the necessary party no later than

12:00 p.m. on October 20, 2022. As of this filing, DVE has failed and refused to provide the necessary affidavits or otherwise assist or cooperate with CCC's efforts to cause zoning classifications for the Premises which would allow for the Permitted Use under the Lease.

15.      CCC has been damaged by these actions.

**DVE and Burton's Agreement with CCC and Conversion of CCC Assets**

16.      On May 19, 2022, DVE and Burton entered into a Letter Agreement with CCC, a copy of which is attached as **Exhibit C**.

17.      Among other provisions, the Letter Agreement provided that DVE and Burton would execute a memorandum of amendment in connection with the Lease, assist CCC in acquiring certain identified oil and gas leases, and enter into a consulting agreement whereby Burton would act as contract operator for the new oil and gas leases.

18.      DVE and Burton did not comply with these obligations in the Letter Agreement.

19.      While CCC provided DVE with the memorandum of amendment for the Lease, DVE did not execute that amendment.

20.      Pursuant to the terms of the Letter Agreement, CCC provided Burton a consulting agreement with CCC however, Burton did not sign that agreement.

21.      Further, Burton and DVE did not assist with acquiring the identified oil and gas leases as required by the Agreement.

22.      To the contrary, Burton "assisted" CCC by acting as the contract operator for the wells for a brief period during 2022, but he stepped down from that role on or about October 13, 2022. Upon information and belief, Burton engaged in a series of fraudulent transactions wherein he would transfer money from CCC's accounts to his own personal accounts as well as DVE's

account, and then would then submit fabricated invoices to purportedly justify the appropriation of those funds.

23.    Specifically, Burton was given access to CCC's PayPal account for the limited purpose of paying CCC operating expenses related to CCC's gas lease and Colo Energy Production, LLC's oil lease. Burton did not have authority to use CCC moneys for any other purpose.

24.    Despite this, Burton improperly directed CCC's funds to his own personal accounts as well as to DVE's account.

25.    Upon information and belief, Burton withdrew money from CCC for the "purchase" of equipment that was never actually purchased. Burton also took money from CCC based upon the representation that the money was for paying shipping and transportation costs for equipment for the leases, only for CCC to find out the alleged "shipping charges" were from a company that does not deliver to Kansas, thereby confirming the manufactured charges were fraudulent in nature.

26.    In addition to these conversions, and upon information and belief, Burton further took money from CCC for payment of invoices, employees, or contractors and paid only partial amounts to the employees/contractors/invoices, while "pocketing" the rest for himself and/or for the use of DVE.

27.    Upon information and belief, Burton engaged in further acts of conversion beyond those detailed above which will be the subject of and revealed during discovery.

### Burton's Tortious and Improper Communications

28.    Additionally, Burton (individually or on behalf of DVE) made knowingly false and defamatory statements about CCC to third-parties.

29.    Among these defamatory statements, Burton told third-parties that CCC had engaged in illegal and unlawful conduct, including theft and misappropriation of investor funds, misrepresentations to investors, and failure to comply with contractual obligations.

30.    Burton made these statements despite knowing they were false.

31.    These false statements accused CCC of illegal and unlawful conduct and amounted to defamation per se.

## COUNT I
### Breach of Contract, CCC-DVE Lease Agreement,
### Money Damages or Specific Performance
### (Claim against DVE)

32.    The allegations contained in paragraphs 1 through 31 above are incorporated as though fully set out herein.

33.    CCC and DVE entered into the Lease Agreement for good and valuable consideration. CCC has complied with all of its obligations with respect to the Lease Agreement.

34.    DVE has breached its obligations contained in the Lease, including the Lease's requirements that DVE assist and cooperate with CCC's conditional use permit application.

35.    CCC has engaged in efforts to secure necessary permits for its operations at the Premises. However, DVE has refused to assist and cooperate with these efforts as required by the Lease.

36.    CCC has been damaged by DVE's breach, and the accrual of CCC's damages is ongoing.

37.    The Lease provides specific damages CCC can claim in the event of DVE's breach. As such, CCC is entitled to damages, including "250% of the monthly rent (pro-rated on a 30-day month), until such time as [DVE] has delivered evidence reasonably satisfactory to [CCC] that the Permitted Use complies with the applicable zoning classification."

38.     Alternatively, CCC requests specific performance of the contract. Because of the unique nature of the contract, including its requirement that DVE take specific action to assist CCC with obtaining the necessary permits, specific performance – requiring DVE to provide executed landowner affidavits – is proper.

## COUNT II
### Conversion/Civil Theft, Money Damages
### (Claim against Burton and DVE)

39.     The allegations contained in paragraphs 1 through 31 above are incorporated as though fully set out herein.

40.     As alleged in this Petition, Burton (individually and on behalf of DVE) engaged in a series of falsified transactions wherein he would transfer money from CCC's accounts to his own, or DVE's, accounts.

41.     In some instances, Burton took money from CCC for the "purchase" of equipment that was never actually purchased. Burton also took money from CCC under the representation that the money was for, *inter alia*, paying shipping and transportation costs for equipment being delivered to the lease, only for CCC to find out the supposed shipping charges were supposedly assessed by a company that does not deliver to Kansas.

42.     In addition to these conversions, Burton further took money from CCC for payment of invoices, employees, or contractors and paid only partial amounts of that money to the employees/contractors/invoices, while "pocketing" the rest for himself or DVE.

43.     In committing these actions, Burton and DVE assumed an exercise of the right of ownership over goods, personal chattels, bailments, and/or cash money of CCC without CCC's permission or authorization.

44.     CCC has sustained damages in excess of $41,000 as a result of DVE and Burton's actions.

## COUNT III
### Defamation *Per Se*
### (Claim against Burton and DVE)

45.     The allegations contained in paragraphs 1 through 31 above are incorporated as though fully set out herein.

46.     Burton, individually and on behalf of DVE, knowingly published false and defamatory communications to third-parties regarding DVE.

47.     Among these defamatory statements, Burton told third-parties that CCC had engaged in illegal, unlawful and fraudulent conduct, including theft and misappropriation of investor funds, misrepresentations to investors, and failure to comply with contractual obligations.

48.     Burton made these statements despite knowing they were false.

49.     These false statements accused CCC of illegal and unlawful conduct and amounted to defamation per se.

50.     CCC has been damaged by the publication of these false and defamatory statements.

## PRAYER FOR RELIEF

WHEREFORE, CCC requests the Court enter judgment in its favor and against each of the Defendants, and award CCC the following relief:

(a) Money damages in excess of $75,000.00 against DVE and Burton;

(b) Specific performance with the Lease Agreement requiring DVE to execute necessary affidavits for CCC's CUP application and otherwise assist with CCC's re-zoning efforts as required by the Lease.

(c) CCC's costs incurred in this action; and

(d) such further relief as the Court deems just, equitable, and proper.

Respectfully submitted,

STINSON LLP


By /s/ Luke R. VanFleteren
    Luke R. VanFleteren, KS Bar # 29203
    David E. Bengtson, KS Bar # 1218
    1625 North Waterfront Parkway
    Wichita, KS 67206
    Telephone:  (316) 268-7918
    luke.vanfleteren@stinson.com
    david.bengtson@stinson.com

*Attorneys for Plaintiff Crypto Colo Center Corp.*

DocuSign Envelope ID: 10A01BA8-DAF4-4997-AC50-62483DB95FC9

## LEASE

THIS LEASE ("Lease") is made as of February 16, 2022 (the "Effective Date"), between DEI VITAE ENTERPRISES, LLC, a North Carolina limited liability company ("Landlord"), and CRYPTO COLO CENTER CORP, a Kansas corporation ("Tenant", and together with Landlord, each may be referred to as a "Party"), who hereby agree as follows:

1.  **PREMISES**.  Subject to the covenants and conditions of this Lease, Landlord leases to Tenant, and Tenant leases from Landlord, the approximately 81.9 acres of real property (the "Premises") commonly known and numbered as 8974 N. K-92 Highway, McLouth, Jefferson County, Kansas, as depicted and legally described as set forth on **Exhibit A** hereto, together with the right of ingress and egress.  Landlord warrants and represents that Landlord is the fee owner of the Premises and has all requisite authority to enter into this Lease.

2.  **USE OF PREMISES**.  The Premises shall be used for any lawful commercial purpose, including, but not limited to, the construction, placement, use and operation by Tenant of structures or containers used to house equipment for the processing of mathematical equations to confirm distributed ledger transactions (the "Permitted Use").

3.  **TERM**.  The term of this Lease (the "Term") is for ten (10) years, commencing on June 1, 2022 and ending on May 31, 2032.

The Term may be extended, at Tenant's sole option, for an additional five (5) years (the "Option Term") through the May 31, 2037.  Tenant may exercise its option to extend by sending Landlord written notice of the election to extend at any time during the original term.

4.  **RENT PAYMENTS**.

(a)  Subject to the credit set forth in Section 4(b), beginning on June 1, 2022, Tenant shall pay to Landlord monthly installments of rent in the following amounts:

| Lease Year | Monthly Rent |
|:---:|:---:|
| 1-2 | $8,000.00 |
| 3-4 | $8,250.00 |
| 5-10 | $8,500.00 |
| 11-15* | $8,500.00 |

*Provided Tenant exercises its option to extend.

Each such monthly rent payment will due and payable in advance without notice or demand at Landlord's address, or at any other place Landlord designates in writing.  All subsequent monthly rent installments shall be due and payable on the 1st day of each succeeding month during the Term. For purposes of this Section "Lease Year" shall mean the period beginning on

CORE/3524794.0002/172630508.1

Exhibit A

DocuSign Envelope ID: 10A01BA8-DAF4-4997-AC50-62483DB95FC9

the Effective Date and continuing for consecutive twelve (12) months thereafter, and then every subsequent twelve-month period.

(b)     Reference is made to that certain Promissory Note dated December 20, 2021, made by Landlord, as obligor, in favor of Marlboro Victor Group ("MVC"), as holder, in the principal amount of One Hundred Thousand Dollars ($100,000.00) (the "Note").    Landlord acknowledges and agrees that that due to Landlord's default under the Note and that MVC is an affiliate of Tenant. Notwithstanding any of the Tenant obligations to pay rent under this Section 4, and pursuant to Section  3.3 of the Note, Landlord will provide a credit to Tenant for all rents due by Tenant for Lease Years 1 through 3, and all such rents shall be deemed paid. Tenant will not be obligated to pay any rents until the beginning of Lease Year 4.

5.     **SECURITY DEPOSIT**.  On no later than March 15, 2022, Tenant shall deposit with Landlord the amount of Twenty Thousand Dollars ($20,000.00) (the "Security Deposit) as security for Tenant's performance of Tenant's obligations under this Lease. Should Tenant comply with all of its obligations under this Lease, said security deposit shall be refunded in full to Tenant at the expiration or earlier termination of this Lease. It is agreed that (i) Landlord (and in the case of any subsequent conveyances or transfers, the then grantor or transferor) may deliver the funds deposited hereunder to the purchaser of the interest of Landlord (or the then grantor or transferor) in the Premises if such interest is sold, and thereupon Landlord (or the then grantor or transferor) shall be discharged from any further liability with respect to such deposit

6.     **INDEMNITY.** Landlord and Tenant each agree to indemnify, defend, and hold harmless the other Party and such other Party's lenders, officers, employees, and agents, from and against any and all claims (including third-Party claims), losses, liabilities, obligations, damages, cost and expenses, including reasonable attorney fees (collectively, the "Losses"), to the extent caused by or arising out of (a) the acts or omissions in the operations or activities on the Premises, the Premises and/or the Easements by the indemnifying Party or the employees, agents, contractors, licensees, tenants (other than Tenant if Landlord is the indemnifying Party) and/or subtenants of the indemnifying Party, or (b) a breach of or default by the indemnifying Party under this Lease. Notwithstanding the foregoing, this indemnification shall not extend to Losses exclusively arising from the negligence or intentional misconduct of the indemnified Party. These indemnification provisions shall survive the termination of this Agreement.

7.     **INSURANCE**.  Tenant shall keep any improvement which Tenant constructs or places on the Premises insured at its expense with casualty insurance in the full replacement cost thereof with the customary coverages. Tenant shall maintain, at all times during the Term, comprehensive general liability insurance in a responsible insurance company, licensed to do business in the state in which the Premises are located and satisfactory to Landlord, properly protecting and indemnifying Landlord with single limit coverage of not less than One Million Dollars ($1,000,000.00) for injury to or death of persons and for property damage.   Upon request, Tenant shall furnish Landlord with a certificate or certificates of insurance, in a form acceptable to Landlord, covering such insurance so maintained by Tenant and naming Landlord as an additional insured.

8.     **ASSIGNMENT AND SUBLETTING**.  Tenant may assign or transfer this Lease or sublease the Premises or any part thereof at any time during the Term without Landlord's

Exhibit A

DocuSign Envelope ID: 10A01BA8-DAF4-4997-AC50-62483DB95FC9

consent.  Notwithstanding any permitted assignment or subletting, Tenant shall at all times remain directly, primarily and fully responsible and liable for the payment of the rent herein specified and for compliance with all of its other obligations under the terms and provisions of this Lease.

9.     **CONDITION OF PREMISES**.  Subject to Section 38, Tenant acknowledges that it has inspected the Premises and except as may be provided otherwise in this Lease, Tenant accepts the Premises in its present condition.  Currently there are no buildings or improvements on the Premises other than those constructed by Tenant (or if there are any, Landlord hereby consents to Tenant's removal thereof).  At the end of the Term, except for damage caused by fire or other perils, Tenant, at its expense, shall either: (a) surrender the Premises in the same or similar condition as existed at the time the Premises were accepted and possession taken by Tenant, and have removed all of Tenant's property (including buildings and improvements placed on the Premises by Tenant), from the Premises; or (b) have removed from the Premises all of Tenant's personal property and have repaired any damage to the Premises, buildings and improvements caused by the removal of Tenant's personal property and leave the Premises, buildings and improvements, free of trash and debris and in "broom clean" condition.

10.     **CONSTRUCTION, AND ALL MAINTENANCE AND REPAIR BY TENANT**.  At Tenant's sole cost and expense during the Term, Tenant may remove any buildings and improvements existing on the Premises at the date hereof and may construct any new buildings and improvements on the Premises.  Furthermore, Tenant shall maintain and keep in good order, repair and condition the Premises and all buildings and improvements hereafter constructed thereon, including, but not limited to, parking lots, driveways, utility service lines from the point where they enter the building(s) located on the Premises, interior walls, inside surfaces of exterior walls, fixtures, floor coverings, lighting fixtures, heating, ventilating, air-conditioning, plumbing fixtures and drains sprinkler system, glass, windows, doors, elevator, electrical and other mechanical equipment, appliances and systems, improvements made by and at the expense of Tenant and Tenant's property, including, but not limited to, Tenant's signs and advertisements.  Tenant shall police and keep the driveways, approaches, sidewalks, parking areas, and adjacent alleys that are a part of the Premises clean, orderly, sightly, unobstructed and free from ice and snow.  Tenant shall regularly water, mow, trim, fertilize and otherwise maintain the lawn, shrubs, plants, trees and other landscaping of the Premises.  Tenant shall prevent water pipes on the Premises from freezing.

11.     **LANDLORD'S RIGHT OF ENTRY**.  Landlord or Landlord's agent may enter at reasonable hours to inspect or show the Premises to prospective lenders and purchasers, and to do anything Landlord may be required to do hereunder or which Landlord may deem necessary for the good of the Premises.

12.     **DAMAGE BY CASUALTY**.  If, during the Term, any building or improvement constructed on the Premises by Tenant shall be destroyed or so damaged by fire or other casualty as to become untenantable, then in such event, at the option of Tenant, this Lease shall terminate from the date of such damage or destruction.  Tenant may exercise this option to so terminate this Lease by notice in writing delivered to Landlord within thirty (30) days after such damage or destruction.  Upon such notice, Tenant shall immediately surrender said Premises and all interest therein to Landlord, and Tenant shall pay rent only to the time of such damage or destruction.  If

-3-

Exhibit A

DocuSign Envelope ID: 10A01BA8-DAF4-4997-AC50-62483DB95FC9

Tenant does not elect to terminate this Lease, this Lease shall continue in full force and effect, and Tenant shall expeditiously repair the damaged buildings or improvements on the Premises, placing the same in as good a condition as at the time of the damage or destruction. In either event, Tenant shall remove all rubbish, debris, merchandise, furniture, equipment and its other personal property within five days after the request by Landlord. In no event shall rent hereunder abate due to a casualty to a building or improvement on the Premises.

13. **PERSONAL PROPERTY**. Except as may be caused by acts of negligence of Landlord, Landlord shall not be liable for any loss or damage to any merchandise, inventory, goods, fixtures, improvements or personal property of Tenant in or about the Premises, as a result of any casualty.

14. **ALTERATIONS**. As previously stated, Tenant shall have the right to raze any buildings or improvements located on the Premises at any time during the term of this Lease. Furthermore, Tenant may make any alterations, additions or removals of any buildings or improvements on the Premises without the prior written consent of Landlord.

15. **UTILITIES AND SERVICES**. Tenant shall furnish and pay for all electricity, gas, water, fuel, trash removal, and any services or utilities used in or assessed against the Premises.

16. **LEGAL REQUIREMENTS**. Landlord represents that prior to any construction by Tenant thereon, the Premises were in compliance with all laws, orders, ordinances and other public requirements affecting the Premises or the use thereof ("Laws"), and Tenant agrees to comply with all Laws during the Term.

17. **FIXTURES**. All of Tenant's personal property and trade fixtures, and all buildings, improvements, repairs, alterations, additions, installations and non-trade fixtures installed or erected on the Premise by Tenant, shall belong to Tenant and at the expiration or termination of this Lease, shall, at Tenant's option, either be removed by Tenant, or shall remain on and be surrendered with the Premises.

18. **REAL ESTATE TAXES AND SPECIAL ASSESSMENTS**. During the Term of this Lease, Tenant shall pay to Landlord the real estate taxes and installments of special assessments, payable with respect to the Premises as additional rent within thirty (30) days after notice that the same is due. The amount payable by Tenant under this Section shall be pro rated for the partial years, if any, in which this Lease commences and terminates.

19. **EMINENT DOMAIN**. Should all of the Premises be taken under the power of eminent domain or a conveyance in lieu thereof by any authority having the right of condemnation, or if a portion thereof is taken so that the Premises are unsuitable, in Tenant's reasonable opinion, for Tenant's use, then the term of this Lease shall terminate as of the date that title shall vest in the acquiring authority and the rent and other charges shall be adjusted as of the date of such taking. In such case, Landlord shall be entitled to the proceeds of the condemnation award made to Landlord for taking of the land and Tenant shall be entitled to the award for this taking of its leasehold interest and all buildings and improvements placed on the Premises by Tenant affected by the taking. Should any part of the Premises be taken in the

Exhibit A

DocuSign Envelope ID: 10A01BA8-DAF4-4997-AC50-62483DB95FC9

exercise of eminent domain or a conveyance in lieu thereof or in connection therewith, but not such in Tenant's reasonable opinion, as to render the Premises unsuitable for the operation of its business, this Lease shall continue on the same terms and conditions except that the description of the Premises or the real estate taken by right of eminent domain or a conveyance in lieu thereof or in connection therewith shall be modified to reflect such taking. In the event this Lease does not terminate by reason of such taking, the condemnation proceeds from the Premises will be delivered to the Tenant to be used to restore the Premises to a position of occupancy by the Tenant, and rents payable under this lease shall be unaffected.

20.    **WAIVER OF SUBROGATION**. As part of the consideration for this Lease, each of the parties hereby releases the other Party from all liability for damage due to any act or neglect of the other Party occasioned to property owned by said parties which is or might be incident to or the result of a fire or other casualty against loss for which either of the parties is now carrying or hereafter may carry insurance; provided, however, that the releases herein contained shall not apply to any loss or damage occasioned by intentional acts of either of the parties, and the parties further covenant that any insurance they obtain on their respective properties shall contain an appropriate provision whereby the insurance company, or companies, consent to the mutual release of liability contained in this paragraph.

21.    **DEFAULT AND REMEDIES**.

(a)    <u>Event of Default</u>. Each of the following shall be an "Event of Default" under this Lease:  (a) Tenant fails to comply with any term, provision, condition or covenant of this Lease for over ten (10) days following Landlord's written notice to Tenant thereof; (b) Tenant deserts or vacates the Premises for a period exceeding thirty (30) days; (c) any petition is filed by or against Tenant under any section or chapter of the Federal Bankruptcy Act, as amended, or under any similar law or statute of the United States or any state thereof; (d) Tenant becomes insolvent or makes a transfer in fraud of creditors; (e) Tenant makes an assignment for benefit of creditors; (f) Tenant ceases doing business or ceases its legal existence; or (g) a receiver is appointed for Tenant or any of the assets of Tenant.

(b)    <u>Remedies</u>. In the event of any Event of Default by Lessee, and without limiting any other rights and remedies set forth in this Lease, at law or in equity, Lessor shall have the following rights and remedies: upon ten (10) days prior written notice, in addition to and not in limitation of any other remedy permitted by law, to peacefully and lawfully enter upon the Premises either with or without process of law, and to expel, remove and put out Tenant or any other persons thereon, together with all personal property; and, Landlord may terminate this Lease or it may from time to time, without terminating this Lease, rent said Premises or any part thereof for such term or terms (which may be for a term extending beyond the Term) and at such rental or rentals and upon such other terms and conditions as Landlord in its sole discretion may deem advisable, with the right to repair, renovate, remodel, redecorate, alter and change said Premises. At the option of Landlord, rents received by Landlord from such reletting shall be applied first to the payment of any indebtedness from Tenant to Landlord other than rent and additional rent due hereunder; second, to payment of any costs and expenses of such reletting, including, but not limited, attorney's fees, advertising fees and brokerage fees, and to the payment of any repairs, renovation, remodeling, redecorations, alterations and changes in the Premises: third, to the payment of rent and additional rent due and payable hereunder and interest

Exhibit A

DocuSign Envelope ID: 10A01BA8-DAF4-4997-AC50-62483DB95FC9

thereon; and, if after applying said rentals there is any deficiency in the rent and additional rent and interest to be paid by Tenant under this Lease, Tenant shall pay any such deficiency to Landlord and such deficiency shall be calculated and collected by Landlord monthly. No such re-entry or taking possession of said Premises shall be construed as an election on Landlord's part to terminate this Lease unless a written notice of such intention is given to Tenant. Notwithstanding any such reletting without termination, Landlord may at any time terminate this Lease by reason of any default, in addition to any other remedy it may have, it may recover from Tenant the worth at the time of such termination of the excess of the amount of rent and additional rent reserved in this Lease for the balance of the Term over the then reasonable rental value of the Premises for the same period. Either Landlord or Tenant shall have the right and remedy to seek redress in the courts at any time to correct or remedy any default of the other Party by injunction or otherwise, without such resulting or being deemed a termination of this Lease. If either Party shall bring any action under this Lease, for the enforcement of any of its rights, then the losing Party agrees in each and any such case to pay the prevailing Party's reasonable attorney's fees.

22. **LIMITATION OF LIABILITY**. IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY TYPE OF INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE, INDIRECT OR CONSEQUENTIAL DAMAGES, INCLUDING, BUT NOT LIMITED TO, LOST REVENUE, LOST PROFITS (WHETHER OR NOT THEY CONSTITUTE CONSEQUENTIAL DAMAGES), REPLACEMENT GOODS, LOSS OF TECHNOLOGY, RIGHTS OR SERVICES; LOSS OF DATA, OR INTERRUPTION OR LOSS OF USE OF SERVICE OR EQUIPMENT. THE LIABILITIES LIMITED BY THIS SECTION 24 SHALL APPLY EVEN IF SUCH PARTY WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND WHETHER ARISING UNDER THEORY OF CONTRACT, TORT, STRICT LIABILITY OR OTHERWISE AND EVEN IF SUCH PARTY'S REMEDIES FAIL OF THEIR ESSENTIAL PURPOSE; provided, however, that Lessee shall be liable to Lessor for any such damages to the extent arising under Section 24 (toxic or hazardous materials). If applicable law limits the application of the provisions of this Section 22, a party's liability will be limited to the maximum extent possible. The terms of this Section shall survive the expiration or earlier termination of this Lease.

23. **WAIVER**. The rights and remedies of the parties under this Lease, as well as those provided by law, shall be cumulative, and none shall be exclusive of any other rights or remedies. A waiver by either Party of any breach or default of the other shall not be deemed or construed to be a continuing waiver of such breach or default nor as a waiver of or permission, expressed or implied, for any subsequent breach or default.

24. **TOXIC OR HAZARDOUS MATERIALS**. Tenant shall not store, use or dispose of any toxic or hazardous materials in, on or about the Premises, except in compliance with applicable laws. Tenant shall be solely responsible for and shall defend, indemnify and hold Landlord, its agents and employees, harmless from and against all claims, costs and liabilities, including attorney's fees and costs, arising out of or in connection with the Tenant's storage, use or disposal of any toxic or hazardous material in, on or about the Premises including, but not limited to, removal, clean-up and restoration work and materials necessary to return the Premises, and any other property of whatever nature located on the Premises, to their condition existing prior to the date hereof. Notwithstanding the foregoing, Tenant shall have no

Exhibit A

DocuSign Envelope ID: 10A01BA8-DAF4-4997-AC50-62483DB95FC9

obligations under this paragraph for such materials brought to, stored, used or disposed upon the Premises by Landlord.  Tenant's obligations under this paragraph shall survive the termination of this Lease.

25.    **NOTICES**.  Any notice, request, demand or other communication required or permitted to be given hereunder shall be in writing, may be personally served, sent by Certified U.S. Mail, postage prepaid, return receipt requested, or by an internationally recognized overnight delivery or courier service and shall be deemed to have been given when delivered in person or by courier or overnight service or upon receipt when delivered by U.S. Mail, and addressed to the recipients as follows:

<div style="margin-left:2em">

If to Landlord:          Del Vitae Enterprises, LLC
                         2407 Plantation Center Dr., Suite 100
                         Mathews, NC 28105
                         Attn:  _____


If to Tenant:            Crypto Colo Center Corp
                         18 Churchill Court
                         Morganville, NJ 07751
                         Attn:  Max Smetannikov

</div>

Any Party may change its address by giving notice thereof to the other Parties in accordance with this Section.

26.    **SUBORDINATION**.  This Lease shall be subordinate and inferior at all times to the lien of any mortgage and to the lien of any deed of trust or other method of financing or refinancing now or hereafter existing against all or a part of the real property upon which the premises are located, and to all renewals, modifications, replacements, consolidations and extensions thereof.  Upon receipt of a non-disturbance agreement from such lender acceptable in form to Tenant, Tenant shall execute and deliver all documents requested by any mortgagee or security holder to effect such subordination.  In the event of a sale or assignment of this Lease or of Landlord's interest in the Premises or the building in which the Premises are a part, are transferred to any other person because of a mortgage foreclosure, exercise of a power of sale under a mortgage or otherwise, Tenant shall attorn to the purchaser or such mortgagee or other person and recognize the same as Landlord hereunder.

27.    **FORCE MAJEURE.**  Neither Party shall be liable to the other for any failure of performance or equipment, due to causes beyond such party's reasonable control, including but not limited to: acts of God, fire, explosion; any law or direction of any governmental entity; emergencies; civil unrest, wars; unavailability of rights-of-way, third party services or materials; strikes, lock-outs, work stoppages, labor shortages or other labor difficulties; denial of service; attacks, telecommunications failures, failure of the Internet or other events of a type or magnitude for which precautions are generally not taken in the industry (each, a "Force Majeure Event"); provided, however, that no event of force majeure shall excuse the payment by Tenant,

Exhibit A

DocuSign Envelope ID: 10A01BA8-DAF4-4997-AC50-62483DB95FC9

when due, of any amounts required to be paid by Tenant under this Lease, including rent, fees, or any other amount or charges required to be paid by Tenant under this Lease.

28.    **SUCCESSORS**.  The provisions, covenants and conditions of this Lease shall bind and inure to the benefit of the legal representatives, heirs, successors and assigns of each of the parties hereto.

29.    **QUIET POSSESSION**.  Landlord agrees, so long as Tenant fully complies with all of the terms, covenants and conditions herein contained on Tenant's part to be kept and performed, Tenant shall and may peaceably and quietly have, hold and enjoy the Premises for the Term aforesaid, it being expressly understood and agreed that the aforesaid covenant of quiet enjoyment shall be binding upon Landlord, its heirs, successors or assigns, but only during such Party's ownership of the Premises.  Landlord and Tenant further covenant and represent that each has full right, title, power and authority to make, execute and deliver this Lease.

30.    **BANKRUPTCY**.  Neither this Lease nor any interest therein nor any estate hereby created shall pass to any trustee or receiver in bankruptcy or to any other receiver or assignee for the benefit of creditors by operation of law or otherwise during the Term or any renewal thereof.

31.    **GOVERNING LAW**. This Lease shall be governed by, and construed in accordance with, the laws of the State of Kansas.

32.    **ENTIRE AGREEMENT**.  This Lease contains the entire agreement between the parties, and no modification of this Lease shall be binding upon the parties unless evidenced by an agreement in writing signed by Landlord and Tenant after the date hereof.  If there be more than one Tenant named herein, the provisions of this Lease shall be applicable to and binding upon such Tenants, jointly and severally.

33.    **ATTORNEYS' FEES**. In case suit is brought because of the breach of any agreement or obligation contained in this Lease on the part of Landlord or Tenant to be kept or performed, and a breach is established, the prevailing party shall be entitled to recover all expenses incurred in connection with such suit, including reasonable attorneys' fees.  This terms of this Section shall survive the expiration or earlier termination of this Lease.

34.    **FURTHER ASSURANCES**. Each of the parties hereto shall execute and provide all additional documents and other assurances that are reasonably necessary to carry out and give effect to the intent of the parties reflected in this Lease.

35.    **SURVIVAL**. All obligations of either party which are not fully performed by such party prior to the expiration or termination of this Lease or which by their nature are not capable of being fully performed prior to the expiration or termination of this Lease shall survive such expiration or termination of the Term hereof. Any liability for a payment which shall have accrued or relates to any period before the expiration or other termination of this Lease shall survive the expiration or earlier termination of this Lease.

36.    **PARTIAL INVALIDITY**. If any provision of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the

Exhibit A

DocuSign Envelope ID: 10A01BA8-DAF4-4997-AC50-62483DB95FC9

remainder of this Lease, or the application of such provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each provision of this Lease shall remain in effect and shall be enforceable to the full extent permitted by law. Each provision of this Lease shall be valid and enforceable to the fullest extent permitted by law.

37. **COUNTERPARTS**. This Lease may be executed at different times and in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Lease by email with a pdf attachment shall be as effective as delivery of a manually executed counterpart of this Lease.

38. **RE-ZONING**. Promptly following the Effective Date, Landlord shall use commercially reasonable efforts to work in consultation, and cooperate, with Tenant to determine whether the zoning classification for the Premises allows for Tenant's Permitted Use. In the event that the present zoning classification does not allow for Tenant's Permitted Use, Landlord shall use its best efforts to work diligently, and cooperate, with Tenant to cause such zoning classification to allow for Tenant's Permitted Use within thirty (30) days of the Effective Date. If Landlord refuses to work, and/or cooperate, with Tenant to cause such zoning re-classification to allow Tenant's Permitted Use prior to the expiration of such 30-day period, then Tenant may either: 1) terminate this Lease and this Lease shall be of no further force and effect, in which case Landlord shall (i) immediately return the Security Deposit to Tenant, (ii) reimburse Tenant for all of Tenant's out of pocket costs in designing, developing and constructing any improvements on the Premises, and (iii) reimburse Tenant for its reasonable actual attorney's fees in negotiating this Lease; or 2) elect to continue this Lease, and for each day that Tenant is unable to use the Premises for its Permitted Use, Landlord shall credit Tenant 250% of the monthly rent (pro-rated on a 30-day month), until such time as Landlord has delivered evidence reasonably satisfactory to Tenant that the Permitted Use complies with the applicable zoning classification.

[Signature page(s) follow]

Exhibit A

DocuSign Envelope ID: 10A01BA8-DAF4-4997-AC50-62483DB95FC9

IN WITNESS WHEREOF, the parties hereto have hereunto subscribed their names as of the date first written above.

**LANDLORD**:

DEI VITAE ENTERPRISES, LLC
a North Carolina limited liability company

By: _Reuben Burton_ _____

Name: Reuben Burton

Title: Managing Director

**TENANT**:

CRYPTO COLO CENTER CORP
a Kansas corporation

By: _Max Smetannikov_ _____

Name: Max Smetannikov

Title: CEO

Exhibit A

DocuSign Envelope ID: 10A01BA8-DAF4-4997-AC50-62483DB95FC9

**EXHIBIT "A"**
**Depiction of Premises**



**Legal Description of Premises**

[LEGAL DESCRIPTION TO BE INSERTED]

Exhibit A



Anna M. Krstulic
**PARTNER**

DIRECT: 816.691.2426
OFFICE: 816.842.8600

anna.krstulic@stinson.com

October 17, 2022

VIA OVERNIGHT DELIVERY AND ELECTRONIC MAIL

Dei Vitae Enterprises, LLC
2407 Plantation Center Drive, Suite 100
Mathews, North Carolina 28105
Attn:   Reuben Burton, Managing Director (rbjr@novafinllc.net)
        Susan H. Burton, Registered Agent (susanhburton@outlook.com)

Re:     Demand for Execution of Affidavit – 8974 N. K-92 Highway, McLouth, Jefferson County,
        Kansas (the "Premises")

Mr. and Ms. Burton:

        The undersigned is counsel for Crypto Colo Center Corp., a Kansas corporation ("Tenant")
with respect to that certain Lease dated February 16, 2022 (the "Lease"), by and between Tenant
and Dei Vitae Enterprises, LLC, a North Carolina limited liability company ("Landlord").
Capitalized terms used but not defined herein shall have the meaning given such terms in the Lease.

        On October 10, 2022, I sent an electronic mail to Mr. Burton requesting execution of an
affidavit required by Jefferson County, Kansas in connection with Tenant's application for a
conditional use permit to allow Tenant's Permitted Use on the Premises.  As of the date of this letter,
Landlord has failed to transmit the affidavit, despite multiple follow-up communications via
electronic mail to address questions and check delivery status.  On October 15, 2022, Ms. Burton
indicated that Landlord would not provide the requested affidavit.

        Section 38 of the Lease requires Landlord to use its best efforts to work diligently and
cooperate with Tenant in connection with securing the zoning classification necessary for the
Premises to allow Tenant's Permitted Use.  In addition, Section 34 sets forth the parties' agreement
to execute and provide all additional documents and other assurances that are reasonably necessary
to carry out and give effect to the intent of the parties reflected in the Lease.  If Landlord refuses to
cooperate with Tenant's efforts to secure the zoning entitlements necessary for the Permitted Use,
Tenant may pursue one or more of the remedies set forth in Section 38 which include:
(1) terminating the Lease and recovering from Landlord (i) the Security Deposit,
(ii) reimbursement of all of Tenant's out-of-pocket costs in designing, developing and constructing
any improvements on the Premises, and (iii) reimbursement of Tenant's reasonable actual attorneys'
fees in negotiating the Lease; or (2) continuing the Lease and Landlord shall credit Tenant 250%
of the monthly rent for each day that Tenant is unable to use the Premises for the Permitted Use
until such time as Landlord delivers evidence reasonably satisfactory to Tenant that the Permitted
Use complies with the applicable zoning classification.  Tenant reserves the right to exercise any

Dei Vitae Enterprises, LLC
October 17, 2022
Page 2

and all additional rights and remedies it may have, and this letter shall not act as a waiver of any such rights or remedies.

Two (2) copies of the affidavit are enclosed herewith.  Tenant demands that Landlord:

1.  Execute and notarize both copies of the affidavit;

2.  Send color .pdf copies of the executed and notarized affidavits via electronic mail to the undersigned;

3.  Send the original executed and notarized affidavits via overnight delivery to the address below; and

> Steve Tufte
> American Surveying, LLC
> 7531 US 59 Hwy
> Oskaloosa, KS 66066

4.  Provide tracking information via electronic email to the undersigned, which evidences overnight delivery to Mr. Tufte no later than 12:00 p.m. on October 20, 2022.

If Landlord does not complete each of Tenant's demands by 12:00 p.m. on October 20, 2022, Tenant may elect to pursue its rights and remedies set forth in the Lease.  Please contact me if you have any questions about this letter or Tenant's conditional use permit application.  Thank you for your prompt attention to this matter.

Sincerely,

**Stinson LLP**

Anna M. Krstulic

Enclosures

cc:    Donato Guadagnoli (via electronic mail: donato@GA-THEFIRM.com)
David Bengston (via electronic mail: david.bengston@stinson.com)
Luke VanFleteren (via electronic mail: luke.vanfleteren@stinson.com)

Exhibit B

DocuSign Envelope ID: 60D63762-A86D-44F3-9215-C3565ZE2BAF2

**Crypto Colo Center Corp**
523 Dawson St
Lot 5
Easton, Kansas 66020

May 19, 2022

**VIA EMAIL**
Dei Vitae Enterprises, LLC
Attn: Reuben Burton
105 Graham Hall Court
Weddington, NC 28104
Email: rbjr@novafinllc.net

**Re: Main Terms of Agreement Dei Vitae Enterprises, *et al*. -w- Crypto Colo Center Corp, *et al*.**

Dear Reuben:

This letter agreement shall set forth the material terms of agreement between Dei Vitae Enterprises, LLC ("DVE") and Reuben Burton ("Burton"), on the one hand and Crypto Colo Center Corp ("CCC") and Colo Energy Productions, LLC ("CEP"), on the other hand. It is the intention of the parties hereto to enter into definitive agreements, in connection with each of the below items, within thirty (30) days of the date first set forth above. Until such time as such definitive agreements are entered into between the parties hereto, this letter agreement shall be deemed valid and legally binding.

1. <u>Bower Lease</u>. DVE is the landowner of 80 acres of land ("Bower Land") which contains oil and gas wells known as the Bower Lease (full legal description in definitive agreement).

(a) DVE will enter into a lease agreement with CCC for the working interest in and to the gas rights on the Bower Land ("Bower Gas Lease"), and enter into a lease agreement with CEP, for the working interest in and to the oil rights on the Bower Land ("Bower Oil Lease"). The Bower Gas Lease and the Bower Oil Lease, together the " Bower Leases".

(b) CCC will pay DVE $5,000 in exchange for the Bower Gas Lease, payable upon full execution of the Bower Gas Lease. CCC will cause the Bower Gas Lease to be recorded promptly thereafter.

(c) CEP will: (i) pay DVE $5,000 in exchange for the Bower Oil Lease, payable upon full execution of the Bower Oil Lease. CEP will cause the Bower Oil Lease to be recorded promptly thereafter; and

(ii) In addition to its landowner royalty, DVE shall have the right to collect from CEP, five percent (5%) of CEP's net profits from CEP's (or CEP's assignee's or designee's) sale of oil from the Bower Oil Lease ("DVE Oil Profits").

Exhibit C

DocuSign Envelope ID: 60D63F62-A96D-44F3-9215-C3565ZE2BAF3

(d)     Along with entering into the Bower Leases, as set forth above, DVE will grant the necessary rights to both CEP and CCC for any water wells on the Bower Land necessary for CEP and CCC to operate its business as intended.

2.     <u>Amendment to Land Lease Agreement.</u>

(a)     Reference is hereby made to the land lease agreement by and between DVE and CCC, entered into as of February 16, 2022, in full force and effect as of the date hereof (the "Land Lease Agreement").

(b)     DVE will execute a memorandum of amendment, in connection with the Land Lease Agreement which *inter alia* secures negative covenants from DVE regarding the sale of the subject land and amends the leased area to include all 81.42 acres of the Bower Land. CCC will promptly record the Land Lease and memorandum of amendment. In exchange for the foregoing amendment, CCC will make a one-time payment of $10,000 to DVE, payable promptly after full execution of the memorandum of amendment.

3.     <u>Acquisition of Bower 2, Mcleods and Willits Leases</u>.

(a)     DVE and/or Burton will assist CCC and CEP in acquiring the working interest in and to each of the leases in the so-called Bower 2, Mcleods and Willits Leases ("New BMW Leases") directly from the landowners of such leases.

(b)     DVE and/or Burton will assist CCC and CEP in "unitizing" the New BMW Leases and the Bower Leases.

4.     <u>Consulting Agreement with Burton.</u>

(a)     CCC will enter into a consulting agreement with Burton as a consulting operator, for the sum of *TBD* per month, for a term of one year. The term may be renewed with the written and signed consent of both parties.

(b)     Burton will:

(i)     Act as operator of the New BMW Leases for both CCC and CEP, by consulting closely with CCC's and CEP's main property and lease managers; and

(ii)     Promptly assist CCC and CEP in obtaining an operator's license in each of its respective names.

5.     <u>DVE Share in CCC Increase.</u>

(a)     Upon execution of the Bower Leases and the New BMW Leases, as set forth above, CCC shall arrange to transfer that amount of common shares equal to an additional 3% equity interest in and to CCC to DVE, so that DVE's total interest in CCC, as of the date of the signing of the Bower Leases and New BMW Leases, will be 5%.

Exhibit C

DocuSign Envelope ID: 60B63F62-A86D-44F3-9215-C3565ZF2B5AF3

6.    <u>Warranty and Representations</u>. The parties hereto each warrant and represent that each has the power and authority to enter into this letter agreement. DVE warrants and represents that: (i) it owns all right title and interest in and to the Bower Land and there are currently no valid leases or claims to the working interest for the oil or gas on the Bower Land, (ii) DVE has the right to grant all of the rights granted to CCC and CEP hereunder, and (iii) **DVE and Burton warrant, represent, acknowledge and agree that each has read and understands this letter agreement, and each acknowledges and agrees that CCC has advised DVE and Burton to obtain independent legal counsel in connection with the execution of this letter agreement and each warrants, represents, acknowledges and agrees that each has either obtained such independent legal counsel or has voluntarily waived its right to do so.**

7.    <u>Confidentiality</u>. (a)    This letter agreement, the matters discussed herein and information provided by one party hereto to the other in connection herewith (collectively, "Information") are confidential and shall not be disclosed by the receiving party hereto without the written consent of the other, except to the extent that disclosure is required by law. When disclosure is required, the party hereto making the disclosure shall provide notice of the intended disclosure to the other party hereto and shall take all reasonable steps to limit the extent of the disclosure to the minimum required to comply with its legal obligations.

(b)    Neither party hereto shall have any obligation with respect to any Information that is or becomes publicly available without fault of the party hereto receiving the Information.

(c) The parties hereto further agree that the terms of this letter agreement are confidential, and each party hereto shall take all reasonable measures to ensure that such terms shall be maintained in strictest confidence, and shall not be divulged to any third party, other than such party's attorneys, accountants, directors and officers, without the written consent of the other party hereto, or except as may be necessary to comply with an order of any federal, state or local court, agency or applicable law or regulation.

8.    A duly executed facsimile/electronic mail copy of this letter agreement shall be deemed as an original, binding and enforceable agreement in every respect. An original hard copy of the same shall be made available to the other party hereto upon request. This letter agreement may be executed in any number of counterparts (including by e-mail or fax transmission), each of which shall be deemed to be an original, and all of which together shall constitute but one and the same instrument.

9.    The parties hereto agree that this letter agreement and all provisions hereof shall be binding and inure to the benefit of the parties hereto, their respective principals, shareholders, legal representatives, and permitted successors and assigns.

10.    The parties hereto agree that, should any provision of this letter agreement be or become invalid by virtue of applicable law(s) or otherwise fail by lack of enforceability, then the letter agreement shall remain in full force and effect and the invalid or unenforceable provision shall be replaced by provisions to be mutually agreed upon between both parties hereto, within the spirit and intent of this letter agreement. Furthermore, the parties hereto agree that if any part of this letter agreement is contrary to,

Exhibit C

DocuSign Envelope ID: 60D63F62-A96D-44F3-9245-C3565ZF2BAF2

prohibited by, or deemed invalid under applicable laws or regulations, such provision or portion thereof shall be inapplicable and deemed omitted to the extent so contrary, prohibited or invalid, but the remainder hereof shall not be invalidated thereby and shall be given effect so far as possible.

11.    The parties hereto hereby agree that the terms and provisions of this letter agreement constitute the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes and replaces all prior and/or contemporaneous understandings or agreements, written or oral, regarding such subject matter.

**IN WITNESS WHEREOF**, the parties hereto have executed this letter agreement, effective as of the date first written above.

Very truly yours,

**CRYPTO COLO CENTER CORP**

By: *Max Smetannikov*
A2D0548D2C9F44C

Name:  Max Smetannikov

Title:    CEO

**COLO ENERGY PRODUCTIONS, LLC**

By: *Max Smetannikov*
A2D0548D2C9F44C

Name: Max Smetannikov

Title:   CEO

**AGREED AND ACCEPTED:**

**DEI VITAE ENTERPRISES, LLC**

By: *Reuben Burton*
B369039DC4D24D2

Name:  Reuben Burton

Title:    Managing Director

*Reuben Burton*
B369039DC4D24D2

Reuben Burton

Exhibit C