**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | | |
|---|---|---|
| **DEI VITAE ENTERPRISES, LLC** | ) | **Case No. 23-30148** |
| | ) | **Chapter 11** |
| | ) | |
| **Debtor.** | ) | |
| _____ | ) | |

## MOTION FOR AUTHORITY TO SELL PROPERTY FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, OR ENCUMBRANCES PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE

**NOW COMES** DEI VITAE ENTERPRISES, LLC, the debtor and debtor in possession in the above captioned chapter 11 case (the "Debtor"), and hereby moves the Court, for the entry of an order: (i) authorizing the Debtor to approve the selling of substantially all of its assets which comprises of the Assets (defined below) to the assignee of Marigny Oil & Gas, LLC, a Wyoming limited liability company or its designee to be Marigny Partners, Ltd. (the "Proposed Purchaser") by sale, free and clear of all liens, claims, interests, and encumbrances. In support of this motion, the Debtor respectfully represents as follows:

### JURISDICTION

1.     This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue of this case and this motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

3 .     The statutory predicates for the relief requested herein are sections 105(a), 363(b), 363(f), 363(m),  and  363(n)  of Title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule 9013-1(e)(1).

4.      No previous motion for the relief sought herein has been made to this Court.

**BACKGROUND**

5.      The Debtor filed a chapter 11 petition on February 28, 2022.

6.      The Debtor started as a holding company in 2009 to hold interests of certain oil and gas limited liability companies.  Since then, the Debtor acquired real property as well as rights in certain oil and gas wells in the states of Utah, Wyoming, Colorado, Kansas, and Nevada.

7.       The Debtor also holds an interest in a commercial property located in Illinois.

8.      The driving force for the chapter 11 filing was three-part: centralize vast complex litigation in this Court, Court oversight of any sale of the Debtor's property, and reorganize allowed claims to reasonable and true amounts rather than the inflated demanded amounts.

*I.      General Information Concerning the Debtor and Assets*

9.      The Debtor is the owner of 9874 North HWY KS92, McLouth, KS 66054 (the "Real Property").    Prior to the bankruptcy, the parties transferred the Real Property, however, the Debtor has submitted for filing an *Affidavit of Equitable Interest* (the "Affidavit") placing all parties on notice as to the Debtor's interest in the Real property pending approval of this contemplated sale.  Attached hereto as Exhibit A is a true and accurate copy of the Affidavit, which is incorporated by reference as if fully set forth herein.

10.      Additionally, the proposed sale contemplates the sale of personal property previously in the name of NovaFin, LLC, a North Carolina limited liability company ("Nova"). Nova has since been dissolved with its interest and assets rolling up to the owner of Nova, Susan Burton.

11.      The Assets comprise of the Real Property, the rights and interests in Kansas, Colorado, Wyoming and Utah as well as certain personal property.  Attached hereto as Exhibit B

is a *Schedule of Assets* proposed to be sold (the "Assets"), which is incorporated by reference as if fully set forth herein.

12.     The Debtor does not operate the oil and gas well.  Rather, through a pre-petition lease, the Debtor leased the right to operate an oil and gas mine at the Real Property.  The tenants are entities known as Crypto Colo Center Corp. (Gas) ("CCC") as well as Colo Energy Production, LLC[1] (Oil).  Contemporaneous herewith, the Debtor will also be filing a *Motion to Reject* the pertinent leases as the Tenants caused significant damage to the Real Property and related wells.

### II.     *Information Surrounding the Sale of Assets.*

13.     Prior to receiving the Offer (defined below), the Debtor was focused on reorganization and resolving disputes amongst itself and related entities that arose during a corporate proxy fight over the Debtor's subsidiary.  Those negotiations were not fruitful.

14.     Consequently, subject to this Court's approval, the Debtor received a commercially reasonable offer to sell the Assets to the Proposed Purchaser in the amount of $2,200,000.00 (the "Offer").

15.     On September 6, 2022, the parties executed a *Purchase and Sale Agreement* (the "Contract")  Attached hereto as <u>Exhibit C</u> is a true and accurate copy of the Contract, which is incorporated by reference as if fully set forth herein.

16.     Upon information and belief, the Proposed Purchaser on or about August 26, 2022, made a good faith deposit of $30,000.00 (the Deposit") with the Debtor.

---

[1] Upon information and belief, the Debtor believes that the oil lease was assigned to an entity known as Major Victor Group.

17.     Thereafter, the Proposed Purchaser made a subsequent payment of $200,000.00 also deposited with its counsel, which, upon information and belief, remains there pending approval by this Court.

### III.     Secured Claims against Real Property of the Debtor.

18.     The Real Property is encumbered by a purported domesticated judgment filed on September 29, 2022 in favor of Natan Holdings, LLC ("Natan").    Natan received its alleged judgment via default judgment, and as such, no such adjudication on the merits has occurred.

19.     Upon information and belief, prior to the Petition Date, Natan was attempting to confirm a foreclosure against the Real Property with a credit value of $500,000.00.

20.     The Real Property has a junior lien holder pursuant to that certain deed of trust in favor of FZA Note Buyers, LLC, in the original principal amount of $150,000.00, No. 2022R3402.

21.     As of the Petition Date, the Debtor does not have any additional claims or debt encumbering the Real Property.

22.     Thus, the Offer permits a significant return to the estate above the value of even Natan's valuation of the Real Property evidenced by the credit bid.

### PROPOSED SALE

23.     The Debtor respectfully requests the entry of an order approving the terms of the proposed sale and the Contract with findings and conclusions that provide as follows:

(a) That the Debtor shall transfer the Assets to the Proposed Purchaser pursuant to Sections 363(b) and (f) of the Bankruptcy Code;

(b) That the Contract and any duly executed ancillary documents such as deeds and bills of sale shall transfer the Assets to the Proposed Purchaser pursuant to Sections 363(b) and (f) of the Bankruptcy Code;

(c) That the Purchaser shall have and acquire at closing good, valid and marketable title to the Assets and the same shall be sold and conveyed to Purchaser free and clear of any and all liens, claims, leases, encumbrances and interests;

(d) That the liens, claims, encumbrances and interests shall attach to the proceeds of the sale with the same validity, priority and extent that existed as to the Assets;

(e) That the Assets shall be found to be a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code;

(f) That neither the Debtor nor the Proposed Purchaser engaged in any conduct that would cause or permit the sale of the Real Property to be avoided under 11 U.S.C. § 363(n);

(g) That the consideration provided by the Assets for the Real Property (a) is fair and reasonable, (b) will provide a greater recovery for the Debtor's creditors than would be provided by any other practical available alternative, and (c) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code as well as the laws of the United States and North Carolina; and

(h) That the Court shall waive any stay that would otherwise be applicable to the immediate effectiveness of the order approving the sale pursuant to Bankruptcy Rule 6004(h); and

(i) That $100,000 of the $2,200,000.00 purchase price be allocated towards the personal property and the same to go to the chapter 13 estate of Susan Burton[2].

---

[2] Ch. 13 Case No. 23-30128

## LAW & ARGUMENT

24.     Pursuant to Section 363(b) of the Bankruptcy Code, a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."

25.     A debtor must demonstrate a sound business justification for a sale or use of assets outside the ordinary course of business.  *See Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991); *In re Continental Air Lines*, 780 F.2d 1223, 1226 (5th Cir. 1986); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063, 1068-69 (2nd Cir. 1983); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991).

26.     A myriad of factors are used by Courts to determine whether a sound business justification exists, including: (i) whether there is a sound business reason for the proposed transaction, (ii) whether there is fair and reasonable compensation being provided by the proposed transaction, (iii) whether the transaction has been proposed and negotiated in good faith; and (iv) whether adequate notice has been provided.  *Committee Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2nd Cir. 1983) (setting forth the "sound business purpose" test); *In re Abbots Dairies of Pa., Inc.,* 788 F.2d 143, 146-47 (implicitly adopting the articulated business justification test of In re Lionel Corp. standard and adding the "good faith" requirement); *In re Charlotte Commercial Group, Inc.*, 2002 WL 31055241, *3 (Bank. M.D.N.C. Aug. 12, 2002) (unreported decision by Judge Aron adopting Lionel).

27.     Under section 506(c) of the Bankruptcy Code, a trustee or debtor-in-possession "may recover from property securing an allowed claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim." 11 U.S.C. § 506(c).

28.     The prime purpose of section 506(c) is "to prevent a secured creditor from gaining a windfall at the expense of the estate." *Loudoun Leasing Development Co. v. Ford Motor Credit Co. (In re K & L Lakeland, Inc.)*, 128 F.3d 203 (4th Cir. 1997) (*internal citations omitted*).

29.     Here, sound business justification exists as the proposed sale of the Assets is the most efficient and cost effective of the options available to the bankruptcy estate.  Further, notwithstanding the anticipated bona fide dispute amongst the parties, the proposed sale permits a significant return to the bankruptcy estate.

30.     Permitting the sale of the Debtor's Assets not only relieves a poor operator from the Real Property but releases the Real Property from any bona fide dispute amongst related parties under 363(f)(4) of the Bankruptcy Code.

31.     For the voluminous reasons elicited herein, through an exercise of its business judgment, the Debtor has determined that the sale of substantial all of its assets, via the Agreement, is in the best interests of the Debtor, its creditors, and other parties-in-interest involved in this matter.

32.     The expenditures incurred by the estate with the proposed sale of the Debtor's Assets is necessary and reasonable considering the alternative courses of action.  Furthermore, the proposed expenses associated with the sale of the Assets confer an actual and direct benefit on the bankruptcy estate as it allows for the maximum return for the estate.

33.     The consideration received by the estate for the sale is fair and reasonable, the transaction has been proposed and negotiated in good faith, and all interested parties have been provided adequate and reasonable notice and consent to the same.

**WHEREFORE**, the Debtor respectfully requests that the Court enter an order granting the relief requested herein and  such other and further relief as is just and proper.

Dated:     Charlotte, North Carolina
           March 21, 2023

                              **ESSEX RICHARDS, P.A.**

                              */s/ John C. Woodman*
                              John C. Woodman (NC Bar No. 42365)
                              David R. DiMatteo (NC Bar No. 35254)
                              1701 South Boulevard
                              Charlotte, North Carolina 28203
                              Tel: (704) 377-4300
                              Fax:  (704) 372-1357
                              E-mail: jwoodman@essexrichards.com

# EXHIBIT A

# AFFIDAVIT OF EQUITABLE INTEREST

STATE OF NORTH CAROLINA    )
                                                     ) SS:
COUNTY OF _Mecklenburg_     )

Susan H. Burton, of lawful age, being first duly sworn upon oath, deposes and states:

(1)    She is a member of Dei Vitae Enterprises, LLC, and is duly authorized to provide this Affidavit on behalf of Dei Vitae Enterprises, LLC.

(2)    Dei Vitae Enterprises, LLC has an equitable interest in the following described real estate located in Jefferson County, Kansas:

Real property described in Exhibit A hereto.

(3)    Said interest is subject to and by virtue of the agreement of Marigny Oil and Gas, LLC, to pay $2,200,000.00 for such property, which amount has not as yet been fully paid.

(4)    This affidavit is for the purpose of serving notice to the public of such equitable interest.

Further affiant sayeth not.

_Susan H. Burton_
SUSAN H. BURTON

SUBSCRIBED AND SWORN TO before me, the undersigned authority, on this 7th day of _March_, 2023.

_Catherine E Padgett_
NOTARY PUBLIC

My appointment expires: _April 24, 2027_

> CATHERINE E. PADGETT
> NOTARY PUBLIC
> Cabarrus County, NC

:T0477854:

# EXHIBIT A

Lot 1 of the Northeast Fractional Quarter of Section 5, Delaware Trust Lands AND
The Northeast Fractional Quarter South of the Delaware Reserve Line of Section
5, Delaware Reserve Lands Township 10 South, Range 20 East of the 6th P.M.,
Jefferson County, Kansas,

EXCEPT any part lying in a tract described as the East 8.16 acres of the Northeast
Fractional Quarter of Section 5, lying both North and South of the Delaware
Reserve line.

Commonly known as: 8974 N. K-92 Highway, McLouth, Jefferson County,
Kansas.

{T0477854}

# EXHIBIT B

## SCHEDULE OF ASSETS

1. All assets, lands, mineral interests, equipment, and intangibles owned or held by DVE and its affiliates in Kansas, Colorado, Wyoming, Utah.

2. A description of oil and gas leases, lands covered by oil and gas leases and the Seller's Working (cost bearing) and Net Revenue (income) Interest in each of the identified Properties.

3. Contracts, Agreements, and instruments to which Seller is a party and which the Properties are bound or subject to.

4. Kansas Assets, Land and Properties:

   9018 N. Hwy 92, McLouth, Kansas 66054 as defined herein:

   Lot 1 of the Northeast Fractional Quarter of Section 5, Delaware Trust Lands AND The Northeast Fractional Quarter South of the Delaware Reserve Line of Section 5, Delaware Reserve Lands Township 10 South, Range 20 East of the 6th P.M., Jefferson County, Kansas,

   EXCEPT any part lying in a tract described as the East 8.16 acres of the Northeast Fractional Quarter of Section 5, lying both North and South of the Delaware Reserve line.

5. Utah Assets listed herein:

CUSIP: 909221 AA1
ISIN: US909221 AA11
ISSUE DESCRIPTION: SR SECD NT 144A
RATE: 8% Simple Annual
MATURITY: 06/30/2030

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| HANSEN 1-23B3 | T02S R03W Sec 23 SENW USBM | 43-013-30161 | FEE | 01093 | Bluebell | DUCHESNE | T02S R03W Sec 23 USBM |
| *UTE 1-34Z2 (1-34-B) | T01W R02W Sec 34 SWNE USBM | 43-013-10494 | 14-20-H62-1704 | 00775 | Bluebell | DUCHESNE | T01W R02W Sec 34 USBM |
| UTE TRIBAL 2-35Z2 (2-35B) | T01N R02W Sec 35 NWSE USBM | 43-013-30106 | 14-20-H62-1614 | 00705 | Bluebell | DUCHESNE | T01N R02W Sec 35 USBM |
| Nielson 1-20B1 | T02S R01W Sec 20 SWNE | 43-013-30740 | FEE | 673 | Wildcat | DUCHESNE | T02S R01W SEC 20 |
| FAUSETT 1-26A1E | T01S R01E Sec 26 NESW | 43-047-30821 | | 870 | East Bluebell | Uintah | T01S R01E Sec 26 |
| Brennan Bottoms 4-15 | T07S R020E Sec 15 NESE | 43-047-31332 | U-14219 | 9760 | Wildcat | Uintah | T07S R020E Sec 15 |
| Wilkins 1-24A5 | T01S R05W Sec 24 NWNE | 43-013-30320 | | 205 | Altmont | Duchesne | T01S R05W Sec 24 |
| Horseshoe Bend 34-13 | T06S R021E Sec 34 SWNW | 43-047-31595 | U-53861 | 10203 | Horseshoe Bend | Uintah | T06S R021E Sec 34 |
| Josie 1-3B5 | T02S R05W Sec 03 SENE UPM | 43-013-30273 | FEE | 00215 | Altmont | Duchesne | All of S3 T2S R5W |
| Josie 1A-3B5 | T02S R05W Sec 03 NESW UPM | 43-013-30677 | FEE | 00216 | | | |

# EXHIBIT C

*Confidential*

# PURCHASE AND SALE AGREEMENT

### Between Marigny Oil and Gas, LLC

### And

### Dei Vitae Enterprises LLC

### For Oil and Gas Properties and Related Assets

### September 6, 2022

Confidential

## INDEX

### PURCHASE AND SALE AGREEMENT

PURCHASE AND SALE AGREEMENT ................................................................ 1
  1.    Preamble ................................................................................................. 3
  2.    Definitions ............................................................................................. 3
  3.    The Properties......................................................................................... 6
  4.    Purchase Price. ....................................................................................... 7
  5.    Closing. .................................................................................................. 7
  6.    Effective Date, Proration of Production and Expenses. ...................... 7
  7.    Taxes...................................................................................................... 8
  8.    Condistions Precendent ........................................................................ 8
  9.    Indemnity............................................................................................... 8
  10.   Representations and Warranties of Seller............................................ 9
  11.   Representations by Buyer.  Buyer represents to Seller that the following
       statements are true and correct: ......................................................... 13
  12.   Title and Other Examinations and Curative. .................................... 13
  13.   Conditions. .......................................................................................... 14
  14.   Transfer, Documentary Taxes, Commissions, and Brokerage Fees. ... 15
  15.   Further Assurances, Intent.................................................................. 15
  16.   Notices. ................................................................................................ 15
  17.   Parties in Interest. ............................................................................... 16
  18.   Rule of Law. ........................................................................................ 16
  19.   Complete Agreement. ......................................................................... 17
  20.   Survival................................................................................................ 17
  21.   Termination.......................................................................................... 17





Confidential

# PURCHASE AND SALE AGREEMENT

### For

### Oil and Gas Properties and Related Assets

### 1. Preamble

Dei Vitae Enterprises LLC, a North Carolina company, as "Seller," and Marigny Oil and Gas, LLC, a Wyoming company, as "Buyer," are entering into this Purchase and Sale Agreement (the "Agreement"), on this day September, 6, 2022, as evidence of Seller's agreement to sell, and Buyer's agreement to buy the assets and properties described in and subject to this Agreement.

The Buyer and Seller shall collectively be known as the "Parties" or individually the "Party".

WHEREAS, DVE owns and/or controls land rights and oil and gas mineral rights in Kansas, Colorado, Wyoming and Utah;

WHEREAS, DVE has agreed that it will transfer 100% of its ownership in all its Kansas, Colorado, Wyoming and Utah land, land rights, Mineral rights, Oil and Gas, assets, tangible and intangible assets (as described in Exhibit "A") to MOG.

WHEREAS, MOG has agreed that it will purchase 100% of DVE's ownership in all its Kansas, Colorado, Wyoming and Utah land, land rights, Mineral rights, Oil and Gas, assets, tangible and intangible assets (as described in Exhibit "A") per the terms of this Agreement.

NOW, THEREFORE, in consideration of the premises and the respective representations, warranties, covenants, agreements and conditions contained herein, the Parties hereto agree to this Agreement as follows:

### 2. Definitions

For all purposes of this Agreement, the following terms shall have the respective meanings set forth in this Article (such definitions to be equally applicable to both the singular and plural forms of the terms herein defined):

a. "Affiliate" means, with respect to any specified Person, any other Person who or which, directly or indirectly, controls, is controlled by, or is under common control with such specified Person, including any partners, officer, director, member or employee of such Person. For purposes of this definition, "control" (including, with correlative meanings, "controlling", "controlled by", and "under common control with") means the power to direct or cause the direction of the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by Contract or otherwise.

Confidential

b. "Agreement" has the meaning set forth in the first paragraph of this document.

c. "Assets" shall mean the Assets contributed to MOG from DVE and shall be defined in Exhibit A.

d. "Capital" shall mean any capital contributed to MOG the Parties and their affiliates.

e. "Claim" means any demand, complaint, claim, action, investigation, legal proceeding or arbitration, whether or not ultimately determined to be valid.

f. "Code" means the Internal Revenue Code of 1986, as amended.

g. "Company" has the meaning set forth in the first paragraph of this document.

h. "Company Indemnitees" has the meaning set forth in Section___.

i. "Consent" means any authorization, consent, approval, filing, waiver, exemption or other action by or notice to any Person.

j. "Contract" means a contract, lease, license, sublicense, agreement, commitment, sale or purchase order, or binding understanding, whether oral or written, that is in effect as of the date of this Agreement.

k. "Damages" has the meaning set forth herein.

l. "Effective Date" has the meaning of September 6, 2022 and shall be the date of closing.

m. "Encumbrance" means any charge, Claim, community property interest, condition, equitable interest, lien, option, pledge, security interest, right of first refusal or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

n. "Governing Documents" has the meaning set forth herein.

o. "Governmental Authority" means any federal, state, municipal, foreign, international or multinational entity or authority or other governmental department, commission, Board, bureau, agency or instrumentality exercising executive, legislative, judicial, regulatory, administrative or taxing functions of or pertaining to government.

p. "Governmental Authorization" means any approval, Consent, license, permit, waiver, franchise, registration or other authorization issued, granted, given, made available or otherwise required by any Governmental Authority or pursuant to Law.

q. "Governmental Order" means any judgment, injunction, writ, order, ruling, award or decree by any Governmental Authority or arbitrator.

MOG Initial:           4          DVE Initial:

Confidential

r.  "Indemnity Claim" has the meaning set forth herein.

s.  "DVE" has the meaning set forth in the first paragraph of this document, and shall mean Dei Vitae Enterprises LLC.

t.  "Law" means any constitution, law, ordinance, principle of common law, regulation, rule, statute or treaty of any Governmental Entity.

u.  "Litigation" means any Claim, action, arbitration, mediation, audit, hearing, investigation, proceeding, litigation or suit (whether civil, criminal, administrative, investigative or informal) commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Authority or arbitrator or mediator.

v.  "LLC Agreement" means the Limited Liability Company Agreement of the Parties.

w.  "Material Adverse Effect" means any change, effect, event or condition, individually or in the aggregate, which has had, or, with the passage of time, would reasonably be expected to have, a material adverse effect on the business, condition (financial or otherwise), results of operations, or customer, supplier or employee relationships of Company.

x.  "MIL" shall mean Marigny Investments Ltd.

y.  "MOG" shall mean Marigny Oil and Gas, LLC.

z.  "MPL" shall mean Marigny Partners Ltd.

aa. "Party" or "Parties" has the meaning set forth in the first paragraph of this Agreement.

bb. "Person" means any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Entity or other entity.

cc. "Remedies Exception," when used with respect to any Person, means performance of such Person's obligations except to the extent enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting the enforcement of creditors' rights generally and by general equitable principles.

dd. "SEC" means the Securities and Exchange Commission.

ee. "Securities Act" means the Securities Act of 1933, as amended from time to time.

ff. "Transaction" shall mean the sale of assets from DVE to MOG.



MOG Initial: _____          5          DVE Initial: _____

Confidential

### 3. The Properties

Seller shall assign and convey to Buyer all of Seller's interests and rights in and to the following assets and properties, all of which are collectively referred to in this Agreement as (the "Properties"):

a. 100% of all of the Seller's rights, title and interests (of whatever kind or character, whether legal or equitable, and whether vested or contingent) in and to the lands and property as described in Exhibit "A" including, without limitation, interests in all acreage, lands rights, overriding terrestrial interests, plots, land held by the Seller in fee, simple net profits interests in any part of the lands, and other interests in land rights as described in any of the descriptions set out in Exhibit "A" or by reference to another instrument for description, even though the Seller's interests may be incorrectly described in, or omitted from, Exhibit "A";

b. 100% of all of the Seller's rights, title and interests (of whatever kind or character, whether legal or equitable, and whether vested or contingent) in and to the oil, gas and other minerals in and under and that may be produced from the lands described in Exhibit "A" including, without limitation, interests in oil, gas and/or mineral leases covering any part of the lands, overriding royalty interests, production payments, and net profits interests in any part of the lands or leases, fee royalty interests, fee mineral interests, and other interests in oil, gas and other minerals in any part of the lands, whether the lands are described in any of the descriptions set out in Exhibit "A" or by reference to another instrument for description, even though the Seller's interests may be incorrectly described in, or omitted from, Exhibit "A";

c. 100% of all rights, title, and interests held by the Seller in all presently existing and valid oil, gas and/or mineral unitization, pooling, and/or communitization agreements, declarations, and/or orders and the properties covered or included in the units (including, without limitation, units formed under orders, rules, regulations, or other official acts of any federal, state or other authority having jurisdiction, voluntary unitization agreements, designations, and/or declarations, and any "working interest units" (created under operating agreements or otherwise) as described in any of the descriptions set out in Exhibit "A" or by reference to another instrument for description, even though the Seller's interests may be incorrectly described in, or omitted from, Exhibit "A";

d. 100% of all rights, title and interests held by the Seller in all presently existing and valid production sales (and sales related) contracts, operating agreements, and other agreements and contracts which relate to any of the Properties described in subparagraphs a. and b. above, or which relate to the exploration, development, operation, or maintenance of the Properties or the treatment, storage, transportation, or marketing of production from or allocated to the Properties as described in any of the descriptions set out in Exhibit "A" or by reference to another instrument for description, even though the Seller's interests may be incorrectly described in, or omitted from, Exhibit "A"; and,

MOG Initial:                     6                    DVE Initial:

Confidential

e.  100% of all rights, title and interests of Seller in and to all materials, supplies, machinery, equipment, improvements, and other personal property and fixtures (including, but not limited to the Properties, all wells, wellhead equipment, pumping units, flow lines, tanks, buildings, injection facilities, salt water disposal facilities, compression facilities, gathering systems, and other equipment), all easements, rights-of-way, surface leases, and other surface rights, all permits and licenses, and all other appurtenances, used or held for use in connection with or related to the exploration, development, operation, or maintenance of any of the Properties listed above, or the treatment, storage, transportation, or marketing of production from or allocated to the Properties as   described in any of the descriptions set out in Exhibit "A" or by reference to another instrument for description, even though the Seller's interests may be incorrectly described in, or omitted from, Exhibit "A".

### 4. Purchase Price.

The Buyer shall pay to Seller, per the schedule and amount herein at Closing.

a.  Payment to be paid in cash or immediately available funds, the total sum of Two Million Two Hundred Thousand dollars ($2,200,000 USD) (the "Purchase Price"), subject to the adjustment provided for below.

b.  Payment to be delivered to an account designated by the Seller as listed in Exbibit B".

c.  The Schedule for the payment of the Purchase Price shall be as follows and is listed in Exhibit "C":

   i.  Thirty Thousand Dollars ($30,000.00 USD) paid to Seller as a deposit after closing.

   ii.  Two Hundred Thousand Dollars ($200,000 USD) paid to Seller per month until the full Purchase Price is paid, with such monthly payments to commence the first month after the confirmation that Property has been transferred to Buyer free and clear of all liens and third-party claims.

### 5. Closing.

The sale and purchase of the Properties (the "Closing") is dated September 6, 2022 (the "Closing Date"). At Closing, the Seller shall deliver to Buyer executed assignments and instruments of conveyance of the Properties in form similar to those attached as Exhibit "D", and the Buyer shall deliver to Seller the Purchase Price as described in Section 3.

### 6. Effective Date, Proration of Production and Expenses.

The Effective Date, Proration of Production and Expenses for the Transaction are as follows:

a.  The conveyance by Seller shall be effective as of 7 a.m. local time, where the Properties are located, on September 6, 2022 (the "Effective Date").

MOG Initial:           7          DVE Initial:

Confidential

b. All production from the Properties and all proceeds from the sale of production prior to the Effective Date shall be the property of Seller. Seller shall be responsible for payment of all expenses attributable to the Properties prior to the Effective Date.

c. Buyer shall be responsible for payment of all expenses attributable to the Properties after the Effective Date.

d. An accounting for net proceeds from production less applicable expenses will be made according to a Settlement Agreement in form and substance similar to the Agreement in Exhibit "F."

**7. Taxes.**

The Seller shall be responsible for all taxes relating to the Properties prior to the Effective Date.

The Buyer shall be responsible for all taxes (exclusive of federal, state or local income taxes due by Seller) relating to the Property from and after the Effective Date.

**8. Conditions Precedent**

As part of this Agreement, the Buyer and Seller confirm that all prior agreements, contracts, terms, Letters of Intent, between the Buyer, the Seller, HVL, MPL, and / or MIL are null and void and are replaced by this Agreement in its entirety between the Parties.

**9. Indemnity.**

The Indemnity by each Party shall be as follows:

a. The Seller shall indemnify and hold the Buyer, its directors, officers, employees, and agents harmless from and against any and all liability, liens, demands, judgments, suits, and claims of any kind or character arising out of, in connection with, or resulting from Seller's ownership of the Properties, for all periods prior to the Effective Date. Seller shall remain responsible for all claims relating to the drilling, operating, production, and sale of hydrocarbons from the Properties and the proper accounting and payment to parties for their interests and any retroactive payments, refunds, or penalties to any party or entity, insofar as any claims relate to periods of time prior to the Effective Date.

b. The Buyer shall indemnify and hold Seller harmless from and against any and all liability, liens, demands, judgments, suits, and claims of any kind or character arising out of, in connection with, or resulting from Buyer's ownership of the Properties, for periods from and after the Effective Date. Buyer shall be responsible for all claims relating to the drilling, operating, production, and sale of hydrocarbons from the Properties and the proper accounting and payment to parties for their interests, and any retroactive payments, refunds, or penalties to any party or entity as such claims relate to periods from and after the Effective Date.

MOG Initial:               8              DVE Initial: _____

Confidential

   c. Buyer and Seller shall have the right to participate in the defense of any suit in which one of them may be a party without relieving the other party of the obligation to defend the suit.

**10. Representations and Warranties of Seller.**

Seller represents and warrants to Buyer as follows:

   a. <u>**Organization**</u>. Seller is a corporation duly organized, validly existing, and in good standing under the laws of the State of North Carolina. Seller is qualified to do business in and is in good standing under the laws of each state in which the Properties are located.

   b. <u>**Authority and Conflicts**</u>. Seller has full corporate power and authority to carry on its business as presently conducted, to enter into this Agreement, and to perform its obligations under this Agreement. The execution and delivery of this Agreement by Seller does not, and the consummation of the transactions contemplated by this Agreement shall not: (a) violate, conflict with, or require the consent of any person or entity under any provision of Seller's Articles of Incorporation or bylaws or other governing documents; (b) conflict with, result in a breach of, constitute a default (or an event that with the lapse of time or notice or both would constitute a default) or require any consent, authorization, or approval under any agreement or instrument to which Seller is a party or to which any of the Properties or Seller is bound, except as disclosed in Exhibit "A"; (c) violate any provision of or require any consent, authorization, or approval under any judgment, decree, judicial or administrative order, award, writ, injunction, statute, rule, or regulation applicable to Seller; or, (d) result in the creation of any lien, charge, or encumbrance on any of the Properties.

   c. <u>**Authorization**</u>. The execution and delivery of this Agreement has been, and the performance of this Agreement and the transactions contemplated by this Agreement shall be at the time required to be performed, duly and validly authorized by all requisite corporate action on the part of Seller.

   d. <u>**Enforceability**</u>. This Agreement has been duly executed and delivered on behalf of Seller and constitutes the legal and binding obligation of Seller enforceable in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, reorganization, or moratorium statues, equitable principles, or other similar laws affecting the rights of creditors generally ("Equitable Limitations"). At Closing, all documents and instruments required to be executed and delivered by Seller shall be duly executed and delivered and shall constitute legal, valid, enforceable, and binding obligations of Seller, except as enforceability may be limited by Equitable Limitations.

   e. <u>**Title**</u>.

      i. The Seller has clear, clean, Marketable Title to the Property. For the purposes of this Agreement, "Marketable Title" means such title that will enable Buyer, as Seller's successor in title, (a) to own free and clear the land



MOG Initial: _____           9           DVE Initial: _____

Confidential

in fee simple, (b) to receive from each of the Properties free and clear at least the "Net Revenue Interest" for the wells identified on Exhibit "A" associated with each of the Properties, (c) to own free and clear the mineral rights from the Property listed in Exhibit "A", without reduction, suspension, or termination throughout the productive life of the wells, except for any reduction, suspension, or termination: (a) caused by Buyer, any of its affiliates successors in title or assigns; (b) caused by orders of the appropriate regulatory agency having jurisdiction over a Property that are promulgated after the Effective Date and that concern pooling, unitization, communitization, or spacing matters affecting a Property; (c) caused by any contract described in Exhibit "A" containing a sliding-scale royalty clause or other similar clause with respect to a production burden associated with a particular Property; or, (d) otherwise set out in Exhibit "A." "Marketable Title" also means title that will obligate Buyer, as Seller's successor in title, to bear no greater "Working Interest" than the Working Interest for each of the wells identified on Exhibit "A" as being associated with each of the Properties, without increase throughout the productive life of the wells, except for any increase: (a) caused by Buyer, any of its affiliates, successors in title or assigns; (b) that also results in the Net Revenue Interest associated with the well being proportionately increased; (c) caused by contribution requirements provided for under provisions similar to those contained in the A.A.P.L. Form 610-____ Model Form Operating Agreement; (d) caused by orders of the appropriate regulatory agency having jurisdiction over a Property that are promulgated after the Effective Date and that concern pooling, unitization, communitization, or spacing matters affecting a particular Property; or, (e) otherwise set forth in Exhibit "A."

ii.   "Marketable Title" means the Properties are free and clear of all encumbrances, liens, claims, easements, rights, agreements, instruments, obligations, burdens, or defects (collectively the "Liens"), except for Permitted Encumbrances listed in Exhibit ___ .

iii.   For the purposes of this Agreement, "Permitted Encumbrances" means: (a) liens for taxes not yet delinquent; (b) lessor's royalties, overriding royalties, reversionary interests, and similar burdens that do not operate to reduce the Net Revenue Interest of Seller in any of the Properties to less than the amount set forth on Exhibit "A"; (c) the consents and rights described in Exhibit "A" insofar as such contracts and agreements do not operate to increase the Working Interest of Seller or decrease the Net Revenue Interest of Seller, as set forth on Exhibit "A," for any of the Properties.

iv.   Seller has good, clean and defensible title, subject to the Permitted Encumbrances, to all of the Properties.

f.   **Contracts.**  Exhibit "A" contains a complete list of all contracts, agreements, undertakings (whether written or oral), and instruments that are not described in any other Exhibit to this Agreement that constitute a part of the Properties or by which the Properties are bound or subject.



Confidential

g. **Litigation and Claims.**

    i.    Except as is set forth on Exhibit "___," no claim, demand, filing, cause of action, administrative proceeding, lawsuit, or other litigation is pending, or to the best knowledge of Seller, threatened, that could now or later adversely affect the ownership or operation of any of the Properties, other than proceedings relating to the industry generally and to which Seller is not a named party.

    ii.    No written or oral notice from any governmental agency or any other person has been received by Seller: (a) claiming any violation or repudiation of all or any part of the Properties or any violation of any law or any environmental, conservation or other ordinance, code, rule or regulation; or, (b) require or calling attention to the need for any work, repairs, construction, alterations, or installations on or in connection with the Properties, with which Seller has not complied.

h. **Approvals and Preferential Rights.** Exhibit "__" contains a complete and accurate schedule of all approvals required to be obtained by Seller for the assignment of the Properties to Buyer, and all preferential purchase rights that affect the Properties.

i. **Compliance with Law and Permits.** The Properties have been operated in compliance with the provision and requirements of the applicable oil and gas leases, and all laws, orders, regulations, rules, and ordinances issued or promulgated by all governmental authorities having jurisdiction with respect to the Properties. All necessary governmental certificates, consents, permits, licenses, or other authorizations with regard to the ownership or operation of the Properties have been obtained and no violations exist or have been recorded in respect of such licenses, permits or authorizations. None of the documents and materials filed with or furnished to any governmental authority with respect to the Properties contains any untrue statement of a material fact or omits any statement of a material fact necessary to make the statement not misleading.

j. **Status of Contracts.** All of the Contracts and other obligations of Seller relating to the Properties are in full force and effect. Seller has no knowledge of any other party being in breach of or default of the Contracts, to the extent any breach or default has an adverse impact on any of the Properties. To Seller's knowledge, no other party has given or threatened to give notice of any default, inquired into any possible default, or taken action to alter, terminate, rescind, or procure a judicial reformation of any Contract. Seller does not anticipate any other party to a Contract will be in breach of, default under, or repudiate any of its obligations of a Contract, to the extent such breach, default, or repudiation will have an adverse impact on any of the Properties.

k. **Production Burdens, Taxes, Expenses and Revenues.** All rentals, royalties, excess royalty, overriding royalty interests, and other payments due under or with respect to the Properties have been properly and timely paid. All ad valorem, property, production, severance, and other taxes based on or measured by the



Confidential

ownership of the Properties or the production from the Properties have been properly and timely paid. All expenses payable under the terms of the Contracts identified in Exhibit "A" have been properly and timely paid except for expenses currently paid, prior to delinquency, in the ordinary course of business. All proceeds from the sale of production are being properly and timely paid to Seller by the purchasers of production, without suspense.

l.  **Pricing.** The prices being received for production do not violate any contract, law or regulation. Where applicable, all of the wells and production from the wells have been properly classified under appropriate governmental regulations.

m.  **Production Balances.** Except as described herein., none of the purchasers under any production sales contracts are entitled to "makeup" or otherwise receive deliveries of oil or gas at any time after the Effective Date without paying, at such time, the full contract price for oil or gas. No person is entitled to receive any portion of the interest of Seller in any oil or gas, or to receive cash or other payments to "balance" any disproportionate allocation of oil or gas under any operating agreement, gas balancing and storage agreement, gas processing or dehydration agreement, or other similar agreements.

n.  **Adverse Changes.** Since _(Date)_ the Properties, viewed as a whole, have not experienced any material reduction in the rate of production, other than changes in the ordinary course of operations, changes that result from depletion in the ordinary course of operations, and changes that result from variances in markets for oil and gas production. None of the Properties have suffered any material destruction, damage or loss.

o.  **Well Status.** There are no wells located on the Properties that: (a) Seller is currently obligated by law or contract to plug and abandon; (b) Seller will not be obligated by law or contract to plug or abandon with the lapse of time or notice or both because the well is not currently capable of producing in commercial quantities; (c) are subject to exceptions to a requirement to plug and abandon issued by a regulatory authority having jurisdiction over the Properties; or, (d) to the best knowledge of Seller, have been plugged and abandoned but have not been plugged in accordance with all applicable requirements of each regulatory authority having jurisdiction over the Properties.

p.  **Equipment.** The equipment constituting a part of the Properties is in good repair, working order, and operating condition, and is adequate for the operation of the Properties.

q.  **Current Commitments.** Exhibit "F" contains a true and complete list of: (a) all authorities for expenditure ("AFEs") and other oral or written commitments to drill or rework wells on the Properties or for capital expenditures pursuant to any Contracts, that have been proposed by any person on or after the Effective Date, whether or not accepted by Seller or any other person; and, (b) all AFEs and oral or written commitments to drill or rework wells or for other capital expenditures pursuant to any Contracts, for which all of the activities anticipated in AFEs or commitments have not been completed by the date of this Agreement.

Confidential

r. **Accuracy of Representation.**  No representation or warranty by Seller in this Agreement or any agreement or document delivered by Seller pursuant to this Agreement contains an untrue statement of a material fact or omits to state a material fact necessary to make the statements contained in any representation or warranty, in light of the circumstances under which it was made, not misleading. There is no fact known to Seller that materially and adversely affects, or may materially and adversely affect the operation, prospects or condition of any portion of the Properties that has not been identified in this Agreement.

11. **Representations by Buyer.  Buyer represents to Seller that the following statements are true and correct:**

Buyer represents and warrants to Seller as follows:

a. **Organization.** Buyer is a Wyoming corporation duly organized, in good standing, and qualified to carry on its business in each state in which the Properties are located, and has the power and authority to carry on its business as presently conducted, to own and hold the Properties, and to perform all obligations required by this Agreement.

b. **Authority.**  Pursuant to its bylaws and certificate of incorporation, Buyer has the power and authority to acquire, own, and hold the Properties and to perform the obligations required by this Agreement.

12. **Title and Other Examinations and Curative.**

The examinations are as follows:

a. Prior to Closing, the Buyer shall examine title to the Properties at its own expense. However, Seller shall make available to Buyer all of Seller's title opinions, certificates of title, abstracts of title, title data, records and files relating to the Properties (including without limitation all well files and well logs) and information relating to the Properties as soon as possible after the execution of this Agreement.  Seller will, at Seller's expense, use Seller's best efforts to promptly cure all title defects discovered by Buyer and obtain all consents and waivers of preferential or other rights to purchase from third parties and governmental authorities as in the opinion of Buyer may  be desirable or necessary to the conveyance, assignment, and transfer to Buyer of the Properties.

b. In the event title to the Properties is not satisfactory, or if the Properties are otherwise not as represented, the Buyer may, at its option, either terminate this Agreement at any time on or before Closing, or reduce the Purchase Price by an amount agreeable to both parties.  Seller shall promptly furnish Buyer a copy of all gas contracts, gas transportation and treating agreements, operating agreements and all amendments to each, and provide a schedule showing the status of any gas balancing, take or pay, or other similar arrangements.

c. If Buyer's review and appraisal of the data, Contracts and agreements prior to transfer of the Properties to the Buyer reflects such data, Contracts, or agreements



Confidential

are materially different, and that such difference results in a material difference in the value of the Properties, from those assumed by Buyer at the time of the Closing, Buyer shall have the option to either terminate this Agreement without penalty or request renegotiations of the Purchase Price to reflect the adverse changes.

d. Except for title matters, Buyer must exercise this option, if applicable, on or before (Date), or any material differences shall be deemed waived, but without prejudice to Buyer's other rights under this Agreement.

**13. Conditions.**

The consummation of the sale and purchase contemplated by this Agreement will be subject to the following conditions:

a. The representations and warranties by Seller set forth herein shall be true and correct in all material respects as of the date when made and as of the Closing.

b. There shall have been no material adverse change in the condition of the Properties except depletion through normal production within authorized allowable and rates of production, depreciation of equipment through ordinary wear and tear, and other transactions permitted under this Agreement or approved in writing by Buyer between the date of this Agreement and Closing.

c. All requirements made by Buyer with regard to title to the Properties shall have been fully satisfied or waived by Buyer. All consents, approvals and authorizations of assignments, and waivers of preferential rights to purchase required by Buyer shall have been submitted to and approved by Buyer.

d. Seller and Buyer understand and agree that if: (1) title to the Properties is not satisfactory to Buyer; (2) Seller's actual interests in the Properties is different than as represented by Seller and the difference causes a diminution in Seller's net revenue interest of more than 5.0% of that which Seller represents to own; (3) contracts, claims or litigation to which Buyer takes exception are material; or, (4) Seller fails to comply with any of the conditions set forth in this Agreement; Buyer may, at its option, either terminate this Agreement at any time on or before Closing, or reduce the Purchase Price by an amount agreeable to both parties. However, any reduction in Seller's net revenue interests below that which is represented in Exhibit "A" shall result in an automatic reduction in the Purchase Price commensurate with the reduction in such net revenue interest.

e. The parties shall have performed or complied with all agreements and covenants required by this Agreement of which performance or compliance is required prior to or at Closing.

f. All legal matters in connection with and the consummation of the transactions contemplated by this Agreement shall be approved by counsel for Buyer and there shall have been furnished by Seller such records and information as Buyer's counsel may reasonably request for that purpose.



MOG Initial: _____          14          DVE Initial: _____

Confidential

g. Notwithstanding anything to the contrary in this Agreement, at Buyer's option, Buyer shall have the unilateral right to terminate this Agreement not later than September 30, 2022, if Buyer determines it does not have the rights to obtain and maintain the rights to be Operator of the Properties pursuant to existing Operating Agreements at Closing.

h. Operations shall be transferred from Seller to Buyer at Closing.

**14. Transfer, Documentary Taxes, Commissions, and Brokerage Fees.**

a. The Seller shall pay and bear all documentary or transfer taxes resulting from this transaction.

b. No commission or brokerage fees will be paid by Buyer in connection with this transaction. Seller will indemnify and hold Buyer harmless from any claims of brokers or finders acting, or claiming to have acted, on behalf of Seller.

**15. Further Assurances, Intent.**

It is Seller's intent to convey to Buyer all of Seller's interests, legal, beneficial, or equitable in the Properties. Seller agrees to execute and deliver to Buyer all instruments, conveyances, and other documents and to do such other acts not inconsistent with this Agreement as may be necessary or advisable to carry out Seller's intent.

**16. Notices.**

It is mutually agreed that all notices required or permitted under this Agreement shall be in writing and shall be deemed to have been properly given under or served and shall be effective when: (1) delivered by personal service; or (2) electronically transmitted by email to the herein designated email address(es); or (3) electronically transmitted by facsimile to the herein designated Facsimile Number(s); (4) delivered to one of the specified package international Air Express companies ("Carrier") or the international Postal Air Mail Service, which delivery services to the address or to such other address as may be designated with priority handling service request. Rejection or other refusal to accept or inability to deliver because of changed address, email or facsimile number of which no notice has been given shall constitute receipt of the notice.

At notices and communications required or permitted under this Agreement shall be in writing, delivered to or sent by U.S. Mail or Express Delivery, postage prepaid addressed as follows:

Notice to **Buyer**:

    Company: **Marigny Oil & Gas, LLC**
    Address: 1309 Coffen Avenue, Suite 5575, Sheridan, Wyoming 82801

    Attn: Blake Simpson, Title: Director
    Phone: +1.425.286.0216
    Email: B.Simpson@BlueRidgeMining.io

MOG Initial:                    15                    DVE Initial:

Confidential

Notice to **Seller:**

> Company: **Dei Vitae Enterprises LLC**
> Address: 105 Graham Hall Court Weddington NC 28194
>
> Attn: Reuben Burton, Title: Director
> Phone: 980-242-8195
> Email: rbjr@novafinllc.net

Notice given by personal delivery, courier service or mail shall be effective upon actual receipt. Notice given by telecopier shall be confirmed by appropriate answer back and shall be effective upon actual receipt if received during the recipient's normal business hours, or at the beginning of the recipient's next business day after receipt if not received during the recipient's normal business hours. Any Party may change any address to which Notice is to be given to it by giving Notice as provided above of such change of address.

### 17. Parties in Interest.

This Agreement shall inure to the benefit of and be binding upon Seller and Buyer and their respective successors and assigns. However, no assignment by any party shall relieve any party of any duties or obligations under this Agreement.

### 18. Rule of Law.

This Agreement shall be governed by and construed in accordance with the laws of the State of Wyoming, without giving effect to any choice or conflict of law provision or rule (whether of the State of Wyoming or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Wyoming.

Any dispute relating to this Agreement shall be brought exclusively in the Wyoming, Superior Court or in the United States District Court for the Southern District of Wyoming. By execution and delivery of this Agreement, with respect to any such dispute, each Party knowingly, voluntarily and irrevocably: (i) consents, for itself and in respect of its property, to the exclusive jurisdiction of these courts; (ii) waives any immunity or objection, including any objection to personal jurisdiction or the laying of venue or based on the grounds of forum non convenience, which it may have from or to the bringing of the dispute in such jurisdiction; (iii) waives any personal service of any summons, complaint or other process that may be made by any other means permitted by the State of Wyoming; (iv) waives any right to trial by jury; (v) agrees that any such dispute will be decided by court trial without a jury; and (vi) agrees that any Party to this Agreement may file an original or a copy of this Agreement with any court as written evidence of the consents, waivers and agreements of the Parties set forth in this Paragraph.

Should any litigation be commenced under this Agreement, the successful Party in such litigation shall be entitled to recover, in addition to such other relief as the court may award, its reasonable attorneys' fees, expert witness fees, litigation related expenses, and court or other costs incurred in such litigation or proceeding. For purposes of this clause,

MOG Initial: _____          16          DVE Initial: _____

Confidential

the term "successful Party" means the net winner of the dispute, taking into account the claims pursued, the claims on which the pursuing Party was successful, the amount of money sought, the amount of money awarded, and offsets or counterclaims pursued (successfully or unsuccessfully) by the other Party.

### 19. Complete Agreement.

This Agreement constitutes the complete agreement between the parties regarding the purchase and sale of the Properties. Where applicable, all of the terms of this Agreement shall survive the Closing.

### 20. Survival.

All representatives and warranties in this Agreement shall be deemed conditions to the Closing. The representatives and warranties recited herein shall survive the Closing except for:   All other terms of Agreement shall survive the Closing, including, but not limited to, the indemnification and hold harmless provisions contained in Section 6.

### 21. Termination.

Should either party terminate this Agreement pursuant to a right granted in this Agreement to do so, the termination shall be without liability to the other party, and the non-terminating party shall have no liability to the terminating party.

**IN WITNESS WHEREOF,** The Seller and Buyer hereto asserts that they have read, understand, and agree to all terms herein, have the authority to execute this Agreement on behalf of their principal; obligating all companies, firms, corporations, partnerships, organizations, individuals, and/or entities referenced herein; causing this Agreement to be fully executed and binding upon signature of Seller, for the benefit of the Seller and the Buyer, for the benefit of the Buyer.

*[Signature page to follow]*



Confidential

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

Accepted & Agreed by:

**Dei Vitae Enterprises LLC:**

By: JAMES K LURSON
Name:
Designation: MANAGING DIRECTOR
Passport No/Issuer: NCPL 6353245
Date: September 06, 2022

**Marigny Oil and Gas, LLC**

By:
Name: Blake A. Simpson
Designation: Director/Manager
Passport No/Issuer: 565425270 / USA
Date: September 06, 2022

Confidential

# EXHIBIT "A"
## TO
## PURCHASE AND SALE AGREEMENT

Description of Properties:

1.  All assets, lands, mineral interests, equipment, and intangibles owned or held by DVE and its affiliates in Kansas, Colorado, Wyoming, Utah.

2.  A description of oil and gas leases, lands covered by oil and gas leases and the Seller's Working (cost bearing) and Net Revenue (income) Interest in each of the identified Properties.

3.  Contracts, Agreements, and instruments to which Seller is a party and which the Properties are bound or subject to.

4.  Kansas Assets, Land and Properties:

    9018 N. Hwy 92, McLouth, Kansas 66054 as defined herein:

    Lot 1 of the Northeast Fractional Quarter of Section 5, Delaware Trust Lands AND The Northeast Fractional Quarter South of the Delaware Reserve Line of Section 5, Delaware Reserve Lands Township 10 South, Range 20 East of the 6th P.M., Jefferson County, Kansas,

    EXCEPT any part lying in a tract described as the East 8.16 acres of the Northeast Fractional Quarter of Section 5, lying both North and South of the Delaware Reserve line.

    *[List of assets & Equipment to be provided by DVE]*

5.  Utah Assets listed herein:

CUSIP: 909221 AA1
ISIN: US909221 AA11
ISSUE DESCRIPTION: SR SECD NT 144A
RATE: 8% Simple Annual
MATURITY: 06/30/2030

**ATTACHMENT A - LEASEHOLD DATA**

MOG Ir

Uintah Ventures, LLC owns working interests in these holdings and 100% of this working interest is assigned as security to this Bond Agreement. The property consists of ~10,000 acres of land and this financing statement is to be filed in Uintah and Duchesne Counties, Utah, in the real estate records. The name of record owner is Uintah Ventures, LLC.

Confidential

CUSIP: 909221 AA1
ISIN: US909221 AA11
ISSUE DESCRIPTION: SR SECD NT 144A
RATE: 8% Simple Annual
MATURITY: 06/30/2030

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| HANSEN 1-23B3 | T02S R03W Sec 23 SENW USBM | 43-013-30161 | FEE | 01093 | Bluebell | DUCHESNE | T02S R03W Sec 23 USBM |
| *UTE 1-34Z2 (1-34-B) | T01W R02W Sec 34 SWNE USBM | 43-013-10494 | 14-20-H62-1704 | 00775 | Bluebell | DUCHESNE | T01W R02W Sec 34 USBM |
| UTE TRIBAL 2-35Z2 (2-35B) | T01N R02W Sec 35 NWSE USBM | 43-013-30106 | 14-20-H62-1614 | 00705 | Bluebell | DUCHESNE | T01N R02W Sec 35 USBM |
| Nielson 1-20B1 | T02S R01W Sec 20 SWNE | 43-013-30740 | FEE | 673 | Wildcat | DUCHESNE | T02S R01W SEC 20 |
| FAUSETT 1-26A1E | T01S R01E Sec 26 NESW | 43-047-30821 | | 870 | East Bluebell | Uintah | T01S R01E Sec 26 |
| Brennan Bottoms 4-15 | T07S R020E Sec 15 NESE | 43-047-31332 | U-14219 | 9760 | Wildcat | Uintah | T07S R020E Sec 15 |
| Wilkins 1-24A5 | T01S R05W Sec 24 NWNE | 43-013-30320 | | 205 | Altamont | Duchesne | T01S R05W Sec 24 |
| Horseshoe Bend 34-13 | T06S R021E Sec 34 SWNW | 43-047-31595 | U-53861 | 10203 | Horseshoe Bend | Uintah | T06S R021E Sec 34 |
| Josie 1-3B5 | T02S R05W Sec 03 SENE UPM | 43-013-30273 | FEE | 00215 | Altamont | Duchesne | All of S3 T2S R5W |
| Josie 1A-3B5 | T02S R05W Sec 03 NESW UPM | 43-013-30677 | FEE | 00216 | | | |

Confidential

*[List of assets & Equipment to be provided by DVE]*



Confidential

# EXHIBIT "B"

## TO

## PURCHASE AND SALE AGREEMENT

**Bank account information for Payments to DVE:**

*[Bank Information to be provided by DVE]*

MOG Initial: _____        22        DVE Initial: _____

Confidential

**EXHIBIT "C"**
**TO**
**PURCHASE AND SALE AGREEMENT**

**SETTLEMENT AGREEMENT & SCHEDULE**

This Settlement Agreement (the "Agreement"), is dated September 6, 2022, but effective September 6, 2022, and is between Dei Vitae Enterprises LLC, Seller, and Marigny Oil & Gas, LLC, Buyer. Buyer and Seller are sometimes individually referred to as a "Party" or collectively as the "Parties."

By Assignment, Bill of Sale and Conveyance (the "Assignment"), dated to be effective September 6, 2022, at 7 a.m. (the "Effective Date"), the time to be determined for each locality described on Exhibit "A" to the Assignment being the time observed in each locality, Seller conveyed and assigned to Buyer certain land rights and oil and gas interests and rights (the "Interests") in "Properties," all as more specifically described in the Assignment, which Assignment is incorporated into this Agreement by reference.

Settlement will have been deemed to have occurred when the Seller will have delivered to the Buyer the full and complete ownership rights to the interests in all acreage, lands rights, overriding terrestrial interests, plots, land held by the Seller in fee, simple net profits interests in any part of the lands, and other interests in land rights as described in any of the descriptions set out in Exhibit "A"; or when the Seller will have delivered to the Buyer the full and complete ownership rights in and to the oil, gas and other minerals in and under and that may be produced from the lands described in Exhibit "A" including, without limitation, interests in oil, gas and/or mineral leases covering any part of the lands, overriding royalty interests, production payments, and net profits interests in any part of the lands or leases, fee royalty interests, fee mineral interests, and other interests in oil, gas and other minerals in any part of the lands, whether the lands are described in any of the descriptions set out in Exhibit "A".

This Closing Agreement sets forth certain rights and defines certain obligations and duties of the Parties with respect to the Interests and Properties. Its execution is provided for in the Purchase and Sale Agreement dated September 6, 2022 between Seller and Buyer.

In consideration of the covenants and promises contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the Parties agree as follows:

1. Base Purchase Price. The purchase price for the Interests is $2,200,000 (the "Base Purchase Price"), which shall be adjusted, as provided for in paragraph 2. below, to arrive at the Final Purchase Price.

2. Final Purchase Price. In arriving at the Final Purchase Price, the Base Purchase Price shall be adjusted as follows:

   a. The Base Purchase Price shall be adjusted upward by the following: (1) the value of all merchantable, allowable oil in storage above the pipeline

Confidential

connection at the Effective Date which is credited to the Interests, the value to be determined based on the market price in effect as of the Effective Date, less applicable taxes; (2) the amount of all actual direct operating expenditure (including royalties and production taxes paid with respect to the Interests and excluding any expenses not covered by the reimbursement provisions of applicable operating agreements), or in the absence of such agreements, those expenses normally charged by the Operator and paid by Seller in connection with the operation of the Interests from the Effective Date to the date of this Agreement; and, (3) any other amounts agreed upon by Seller and Buyer, including any gas imbalances at the current applicable contractual market price (or at current spot market price if no contract is in effect).

b. The Base Purchase Price shall be adjusted downward by the following: (1) the proceeds received by Seller from and after the Effective Date to the date of this Agreement attributable to the Interests and which are attributable to production during the period of time between the Effective Date and the date of this Agreement; and, (2) any other amounts agreed upon by Seller and Buyer, including any gas imbalances at the current applicable contractual market price (or at current spot market price if no contract is in effect).

The Base Purchase Price, as adjusted by the provisions of 2.a. and 2.b. above is referred to as the "Final Purchase Price."

The Schedule for the payment of the Purchase Price shall be as follows:

a. Thirty Thousand Dollars ($30,000.00 USD) paid to Seller as a deposit after closing.

b. Two Hundred Thousand Dollars ($200,000 USD) paid to Seller per month until the full Purchase Price is paid, with such monthly payments to commence the first month after the confirmation that Property has been transferred to Buyer free and clear of all liens and third-party claims.

3. Preliminary Amount. Because certain of the adjustments and payments provided for in paragraph 2. cannot be determined as of the date of this Agreement, Seller and Buyer have agreed upon an estimate, through September 6, 2022, of the Final Purchase Price (the "Preliminary Amount") which is to be delivered by Buyer to Seller after the execution and delivery of this Agreement and the full and complete documents transferring clean and clear title to the Buyer, per the terms of the schedule for the payments listed herein.

4. The Preliminary Amount and the values used to determine such amount are set out in the "Preliminary Settlement Statement" attached to this Agreement. As soon as practicable after the date of this Agreement, but no later than 30 days following the Closing Date provided for in the Purchase and Sale Agreement between the Parties, Seller shall prepare (in accordance with this Agreement and generally accepted accounting principles), and submit to Buyer a statement (the

MOG Initial:           24          DVE Initial:

Confidential

"Final Settlement Statement") setting forth each adjustment or payment which was not finally determined as of the date of this Agreement, showing the values used to determine such adjustments. Should the Final Settlement Statement not be submitted to Buyer on or before 30 days following Closing, the amount owed the Buyer, if any, per the Final Settlement Statement, shall bear interest from the 30th day to the date of receipt of the Final Settlement Statement by Buyer at the prime rate of interest plus 3% as used by Citibank. As soon as practicable after receipt of the Final Settlement Statement, Buyer shall deliver to Seller a written report containing any changes which Buyer proposes be made to the Final Settlement Statement. Seller and Buyer shall undertake to agree with respect to the amounts due pursuant to the post-closing adjustment no later than 30 days after the Closing Date. The date upon which the agreement is reached, or upon which the Final Purchase Price is otherwise established, shall be called the "Settlement Date." Should agreement to the amount due to Seller, if any, not be agreed to, as a result of Buyer's delay, no later than 30 days after the Closing Date, the amount owed to Seller shall bear interest from the 30th day to the Settlement Date at the prime rate of interest as used by Citibank. In the event that (a) the Final Purchase Price is more than the Preliminary Amount, Buyer shall pay to Seller the amount of the difference or, (b) the Final Purchase Price is less than the Preliminary Amount, Seller shall pay to Buyer the amount of the difference. The payment shall be made within 45 days of the Settlement Date.

5. Information. Seller agrees to deliver or make available to Buyer all title information, agreements, records, production and operation information and other information and documents pertaining to the Interests which Buyer reasonably requests, which Seller has not previously provided to Buyer, and which Seller is not contractually prohibited from providing.

6. Possession. Seller has delivered to Buyer the Assignment and exclusive possession of the Interests and Properties.

7. Indemnification.

   a. Seller agrees to indemnify, save, and hold Buyer harmless against all claims, costs, expenses, and liabilities with respect to the Interests which relate to times prior to the Effective Date, but not including those incurred by Buyer with respect to the purchase of the Interests by Buyer or the negotiations leading to such purchase, and not including those relating to the title, quality, and quantity of oil, gas, and mineral reserves.

   b. Buyer agrees to indemnify, save, and hold Seller harmless against all claims, costs, expenses, and liabilities with respect to the Interests which relate to times after the Effective Date, but not including those incurred by Seller with respect to the sale of the Interests by Seller or the negotiations leading to such sale, and not including those which result from the negligence or willful misconduct of Seller or Seller's employees or agents with respect to the operation or maintenance of the Interests).



Confidential

    c. Seller agrees Buyer shall be entitled to receive all proceeds, including proceeds from production of oil and gas attributable to the Interests, after the Effective Date.

    d. Buyer agrees Seller shall be entitled to receive all proceeds including proceeds from production of oil and gas attributable to the Interests, before the Effective Date.

8. Files. Seller shall deliver to Buyer, within 48 hours after Closing, all property, lease and well files related to the Interests and Properties; provided, however, Buyer agrees to allow Seller access to those files at all reasonable business hours for inspection and copying if Seller, in Seller's sole opinion, require the files to defend any judicial or administrative action brought by any individual or governmental agency against Seller.

9. Transfer/Division Orders. Buyer recognizes and understands that Buyer is responsible for obtaining transfer/division orders from all purchasers of production from the Interests. Seller agrees to execute all orders or other forms of directions for payment necessary to effect payment to Buyer from and after the Effective Date.

10. Buyer shall pay any sales and/or use taxes occasioned by the sale of the Interests.

This Agreement shall be binding on and inure to the benefit of the Parties and there respective successors and assigns.

EXECUTED and dated September 6, 2022.

Accepted & Agreed by:

Dei Vitae Enterprises LLC.

By:
Name: Reuben Benson
Designation: Managing Director
Passport No/Issuer: NCPL 8355245
Date: September 06, 2022

Marigny Oil and Gas, LLC

By:
Name: Blake A. Simpson
Designation: Director/Manager
Passport No/Issuer: 565425270 / USA
Date: September 06, 2022

MOG Initial: _____          26          DVE Initial: _____

Confidential



Confidential

# EXHIBIT "D"

## TO

## PURCHASE AND SALE AGREEMENT

Form of Instruments of Conveyance to be Delivered at Closing (e.g., Assignment, Bill of Sale, Deed, etc.)

Confidential

# EXHIBIT "E"
## TO
## PURCHASE AND SALE AGREEMENT

Schedule of Claims, Demands, Filings, Causes of Action, Administrative Proceedings, Lawsuits, Litigation



Confidential

## EXHIBIT "F"
## TO
## PURCHASE AND SALE AGREEMENT

Schedule of all Approvals Required to be Obtained by Seller, and Preferential Purchase Rights Affecting the Properties.

MOG Initial: _____     30     DVE Initial: _____

Confidential

# EXHIBIT "G"
## TO
## PURCHASE AND SALE AGREEMENT

Schedule of all authorities for expenditures ("AFEs"), other commitments to drill/rework wells, or commitments to capital expenditures.